830 So.2d 640 (2002)
In the Matter of the ESTATE OF Alexander Taylor GILLIES, Jr., Deceased: John B. Gillis and Luckett Law Firm, P.A.
v.
Alexander Scott GILLIES, Administrator D.B.N. of the Estate of Alexander Taylor Gillies, Jr.
No. 2000-CA-00038-SCT.
Supreme Court of Mississippi.
November 14, 2002.
*641 John B. Gillis, Clarksdale, attorney for appellants.
Patrick F. McAllister, Jackson, attorney for appellee.
EN BANC.

*642 ON MOTION FOR REHEARING

COBB, J., for the Court.
¶ 1. The motion for rehearing is granted. The original opinions are withdrawn, and these opinions are substituted therefor.
¶ 2. In July 1991, Alexander Taylor Gillies, Jr. was severely beaten by a fellow detainee while in the Corinth city jail. Alexander hired the law firm of Langston, Langston, Michael & Bowen (the Langston Firm) to prosecute any civil rights or personal injury claims he might have against the City of Corinth, or others. Alexander died in 1993, and Marietta Gillies, his mother, was appointed administratrix of his Estate.
¶ 3. In 1997, Marietta discovered that the Langston Firm had failed to file a lawsuit within the applicable statute of limitations period. Marietta sought and received approval from the Alcorn County Chancery Court to employ John Gillis of the Luckett Law Firm (collectively, Gillis[1] on a contingency fee basis, to represent the Estate in prosecuting a legal malpractice claim against the Langston Firm.
¶ 4. In February 1999, Ruby Gillies, Alexander's wife at the time of his death, sought to remove Marietta as administratrix of the Estate, alleging Marietta's appointment was fraudulently procured. The chancery court held that Ruby and Alexander Scott Gillies (Scott), Alexander's son from a previous marriage, were the sole heirs at law of Alexander, removed Marietta as administratrix, appointed Scott as successor administrator, and voided Gillis's contingency fee contract with the Estate.[2]
¶ 5. In July 1999, the Estate sought court approval of a settlement reached with the Langston Firm on its legal malpractice claim. The Estate further sought resolution of any fee that might be owed to Gillis for his prior representation. After an evidentiary hearing, the chancery court awarded Gillis a quantum meruit fee of $21,200.
¶ 6. From that judgment, Gillis appeals, raising four assignments of error, edited as follows:
I. AWARDING QUANTUM MERUIT ATTORNEYS' FEES BASED ON AN HOURLY, INSTEAD OF A CONTINGENCY BASIS.
II. REFUSING TO AWARD LITIGATION EXPENSES AND PREJUDGMENT INTEREST.
III. FAILING TO CORRECTLY IDENTIFY THE "PROCEDURAL POSTURE" OF THE CASE AND THE RELIEF SOUGHT.
IV. FAILING TO CORRECTLY IDENTIFY THE "SPECIFIC ISSUE" AT THE TRIAL COURT LEVEL.
¶ 7. The Estate cross-appeals, raising the following assignment of error, similarly edited:
V. FAILING TO REDUCE THE QUANTUM MERUIT FEE DUE TO A CONFLICT OF INTEREST.
¶ 8. Concluding that Gillis's appeal and the Estate's cross-appeal are not well-taken, we affirm.

*643 FACTS

¶ 9. In late 1997, Gillis first notified the Langston Firm about the Estate's legal malpractice claim against it. In January 1998, the parties began discussing a possible settlement of the claim. A few months later, the Langston Firm informed the Estate that it would admit liability, leaving the amount of damages as the only the issue to be resolved. However, soon thereafter, concerns were raised as to whether Marietta did in fact have the authority to settle the Estate's claim, and whether she and her husband were the actual heirs. These concerns arose as information about Ruby and Scott and their potential claim upon the Estate became known.
¶ 10. Even amidst this uncertainty, a mediation settlement conference was held in January 1999, and a second was scheduled for March. On February 9, 1999, Ruby filed her complaint to have Marietta removed as administratrix, because her appointment had been fraudulently procured through false allegations that she and her husband were the decedent's sole heirs at law. Ruby further sought to set aside the contingency contract entered between Marietta (in her capacity as administratrix of the Estate) and Gillis.[3] Three days later, Marietta filed a petition to determine heirship, admitting that Ruby was Alexander's wife at the time of his death, but claiming that Ruby had waived her rights to recover the proceeds of the Estate. Marietta later amended her petition, dropping her waiver claim and her claim that Scott was illegitimate.
¶ 11. Prior to the chancery court's hearing on Ruby's complaint, a second settlement conference was held in late March. Because of the uncertainty as to Marietta's authority to act for the Estate, Ruby and Scott, through their attorneys, entered into a "letter" agreement with Gillis, whereby Gillis would act as "point man" for all claimants. At this stage of the negotiations there were two separate parties seeking damages, Marietta, in her individual capacity, and the Estate, of which Marietta was still the administratrix. Gillis was still representing Marietta in her individual capacity, but Ruby and Scott each had their own separate counsel.
¶ 12. Following a hearing in chancery court, at which oral and documentary proof was offered, the chancellor entered his opinion and judgment on April 8, 1999. In it, the chancellor "set aside and held for naught ... all of Marietta's actions as administratrix of the estate, including the employment of the attorney to handle the legal malpractice." The chancellor went on to note that Gillis had "performed valuable services up to this point in the processing of the legal malpractice claim of the estate and he may be entitled to compensation for these services on a quantum meruit basis." (emphasis added). No appeal was taken from this judgment, therefore, this judgment became final and binding on all parties. Clearly, at that point Gillis could have asked the rightful heirs to execute another agreement which clearly stated that he was to be compensated for future work on a 33 1/3-percent contingency fee basis. He failed to do so, at his own peril.
¶ 13. A lawsuit was never filed against the Langston Firm as the parties were able to reach an out-of-court settlement as *644 to damages. The Langston Firm was seeking a settlement for all claims, and eventually offered $600,000. The respective parties finally agreed to a settlement whereby the Estate would receive $450,000 for its claim, and Marietta would receive $150,000 for her separate claim. Gillis then received a $60,000 fee for Marietta's separate recovery. In July 1999, court approval was sought for the settlement agreement reached with the Langston Firm. The Estate further sought an order awarding no fee, or in the alternative, a $3,000 fee to Gillis.[4] In his answer, Gillis requested a fee of one-third of the $450,000 settlement obtained by the Estate, plus expenses, costs and interest. The chancery court approved the settlement, but continued the hearing to determine whether any legal fee on a quantum meruit basis was owed to Gillis, and if so, in what amount.
¶ 14. Because the contingency contract was not enforceable (i.e. no longer existed), the chancery court ordered Gillis to submit an itemized bill for the work actually performed. Gillis's bill listed 202 hours, at $275 per hour, for a total of $55,550. The chancellor accepted the number of hours submitted, but found the rate excessive based on Gillis's customary rate of $140 per hour and reduced the fee accordingly. The chancellor further reduced the award by one-fourth, the amount of time that would be attributable to his efforts solely on behalf of Marietta, because Marietta had received one-fourth of the total damages paid by the Langston Firm. The chancellor did not award any expenses, costs or interest.

STANDARD OF REVIEW
¶ 15. The findings of a chancellor will not be disturbed on review unless the chancellor was manifestly wrong, clearly erroneous or applied the wrong legal standard. Bank of Miss. v. Hollingsworth, 609 So.2d 422, 424 (Miss.1992). The standard of review regarding attorneys' fees is the abuse of discretion standard. "The fixing of reasonable attorneys' fees is a matter ordinarily within the sound discretion of the trial court...." Gilchrist Tractor Co. v. Stribling, 192 So.2d 409, 418 (Miss.1966).

DISCUSSION
I. AWARDING QUANTUM MERUIT ATTORNEYS' FEES BASED ON AN HOURLY, INSTEAD OF A CONTINGENCY BASIS.
¶ 16. As previously mentioned, prior to the chancellor's voiding Gillis's contingency fee contract with the Estate, the attorneys representing Ruby and Scott signed an amendment to the proposed settlement agreement stating that "they will not attack the validity of John B. Gillis' and Luckett Law Firm, P.A.'s fee arrangement beyond the issues presently before the Chancery Court of Alcorn County, Mississippi, in Ruby Gillies' complaint filed on or about February 9, 1999."
¶ 17. The purpose of this amendment was to present a unified front at the settlement conference. Gillis argues this amendment, in itself, entitled him to a fee on a contingency basis. This is clearly erroneous. Ruby and Scott agreed that *645 they would not challenge the validity of Gillis's fee, other than the challenge as set forth in Ruby's complaint. Ruby's complaint included a prayer that the contingent fee contract be voided ab initio. Gillis further argues that the chancery court abused its discretion and ignored the applicable law in using an hourly rate and time methodology to determine his fee, rather than on a contingency basis. Gillis is essentially arguing that a contingency contract which (1) was entered into by a person who was fraudulently representing the Estate, (2) was later cancelled pursuant to the judgment of the trial court, and (3) was not appealed, is enforceable against the Estate. This is not the law of this State.
¶ 18. After expressly considering the eight factors set forth in Mississippi Rule of Professional Conduct 1.5 for determining a reasonable attorney fee, the chancellor awarded Gillis a quantum meruit fee of $21,210 based on attorney Gillis's normal hourly rate of $140 per hour for 151.5 hours. In making his determination of what a reasonable fee would be in this case, the chancellor specifically cited Mauck v. Columbus Hotel, 741 So.2d 259 (Miss.1999). In Mauck, this Court affirmed the chancellor's award of attorneys' fees on an hourly basis, applying the factors enumerated in Mississippi Rule of Professional Conduct 1.5, even though there was a contingent fee arrangement. Id. at 271-72. In Mauck, we stated: "what is controlling is what is reasonable." Id. at 271. This Court further noted that the factors set forth in Rule 1.5 are almost identical to the "lodestar" factors established by the United States Supreme Court. Id. at 272. Pursuant to Rule 1.5, the factors are as follows:
(1) the time and labor required, the novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.
Miss. R. Prof'l Conduct 1.5. This Court further cited a decision of the United States Supreme Court as follows:
The United States Supreme Court adopted the "lodestar" method of calculating reasonable attorney fees. In calculating the "lodestar" fee,
[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation, multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services....
Mauck, 741 So.2d at 271 (quoting Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)) (emphasis added). In Mauck, we further adopted federal precedent and cited with approval federal cases applying the lodestar factors:
This approach followed by the Supreme Court in regard to federal fee shifting statutes is both logical and fair. The United States Supreme Court determined, that contingency enhancement would make the setting of fees more *646 complex and arbitrary, hence more unpredictable, and hence more litigable.
Id. at 272 (citations & internal quotations omitted).
¶ 19. In the case sub judice, the chancellor cited Mauck, noting that this Court "held that the reasonableness of attorney fees awarded is determined by reference to the factors set forth in Rule 1.5 of the Mississippi Rules of Professional Conduct." The chancellor then listed the eight factors, and concluded:
The court has considered all of these 8 factors set forth in Rule 1.5. The Court does find and it is admitted by all involved that Attorney Gillis did a commendable job in perfecting the settlement involved in this matter. The settlement did require considerable time involvement on his part. The complexity of the issue was not great, as the defendant attorneys had previously admitted liability, the only remaining issue being the amount of damages.
¶ 20. It should be stressed that our rules list eight factors to consider, with none of the eight factors to be given more weight than the others. In Mauck, we followed the U.S. Supreme Court in applying this eight-factor test even though the fee arrangement was contingent, stating:
"The Supreme Court reasoned that to enhance an award because of a contingency fee arrangement would put duplicative weight on this one factor when considering all the lodestar factors." Mauck, 741 So.2d at 272. The dissenting opinion states "that quantum meruit can also be on a basis of percentage, because as oftentimes, lawyers will take a contingency fee contract and not keep up with their hours," citing Tyson v. Moore, 613 So.2d 817 (Miss.1992).[5] Diss. op. at ¶ 45. Merely because quantum meruit can be assessed as a percentage, however, does not render it an abuse of discretion not to assess it as a percentage. Further, Gillis evidently kept scrupulous count of his 151.5 hours, since he submitted that figure to the trial court; therefore, that rationale for a percentage award is not pertinent here.
¶ 21. In the case sub judice, the chancellor determined a reasonable fee, based on the number of hours reasonably expended on the litigation, multiplied by a reasonable hourly rate. He also considered the eight factors enumerated in Rule 1.5, as is required by Mauck. In doing so, he followed the proper procedure that this Court has established for determining reasonable attorney's fees. Thus, he did not abuse his discretion[6], and this assignment of error is without merit.
*647 II. REFUSING TO AWARD LITIGATION EXPENSES AND PREJUDGMENT INTEREST.
¶ 22. Gillis next argues that the chancellor abused his discretion by not awarding expenses, costs, and interest. Gillis argues that he is entitled to recover the necessary expenses of the administration of the Estate, costs as the prevailing party, and pre-judgment interest.
¶ 23. In response, the Estate argues that the chancellor properly rejected Gillis's contention that he is entitled to be paid for estate administration expenses allegedly incurred by Marietta under Miss. Code Ann. § 91-7-299 (1994). We agree this rejection was proper because any claim for Marietta's estate administration expenses would have to be brought by Marietta herself in a proper proceeding before the chancery court, not by Gillis. The Estate also notes that it would have been impossible to determine what administrative expenses Gillis was attempting to recover because his itemized statement submitted to the court failed to include any reference to any of the Estate's administration expenses that he paid. Further, Gillis failed to establish how the expenses at issue benefitted the Estate, rather than Marietta individually. After carefully examining the record, we agree that the chancellor did not abuse his discretion in determining Gillis was not entitled to administrative expenses.
¶ 24. Gillis claims that the chancery court erred in denying costs under Miss. R. Civ. P. 54(d), since he was the prevailing party. The Estate responds that this issue is without merit because Gillis has failed to identify the costs he is entitled to be paid. Further, Gillis was not the prevailing party, in that the chancellor completely rejected his claim that he was entitled to a contingency fee of $150,000. We conclude that the chancellor evidently did not consider either party to be the "prevailing party" since no award of costs was made in this case. Thus, there was no error.
¶ 25. Finally, Gillis claims that he is entitled to prejudgment interest. The Estate responds that prejudgment interest may only be awarded if the amount sought is liquidated. When there is a bona fide dispute as to the amount in issue, a claim is not liquidated. See Aetna Cas. & Sur. Co. v. Doleac Elec. Co., 471 So.2d 325, 331 (Miss.1985) (holding that prejudgment interest may be allowed in cases where amount due is liquidated when claim is originally made, or where denial of claim is frivolous or in bad faith); Grace v. Lititz Mut. Ins. Co., 257 So.2d 217, 225 (Miss. 1972) (holding that party was not entitled to interest on their claim where "there is a bona fide dispute as to the amount of damages as well as the responsibility for the liability therefor."). In the case sub judice, there was a bona fide dispute as to whether Gillis was entitled to a quantum meruit award, and if so, the amount. As such, the claim was not liquidated, and denial of the claim was not frivolous or in bad faith; thus, an award of prejudgment interest was not warranted.
¶ 26. In sum, Gillis has failed to prove that the chancellor abused his discretion in not awarding administrative expenses, court costs, or prejudgment interest. Thus, each component of this assignment of error is without merit.
III. FAILING TO CORRECTLY IDENTIFY THE "PROCEDURAL POSTURE" OF THE CASE AND THE RELIEF SOUGHT.

IV. FAILING TO CORRECTLY IDENTIFY THE "SPECIFIC ISSUE" *648 AT THE TRIAL COURT LEVEL.
¶ 27. Because the next two issues on appeal are related, we discuss them in concert. Essentially, Gillis argues that because the chancellor's opinion and judgment contained numerous inaccuracies, the chancellor committed manifest error requiring reversal.
¶ 28. Gillis recites the following inaccuracies as grounds for reversal. First, the matter was actually before the court not on motion of Gillis for approval of his fees, but on motion by the administrator, Scott, to deny Gillis a fee. Second, Gillis was not Marietta's attorney but rather appeared pro se and as counsel for the Luckett Firm. Third, there was no "malpractice action"; rather, there was a malpractice claim that was settled. Fourth, Ruby and Scott were not parties since there was no action. Fifth, Ruby never filed any papers contesting Gillis's fee. Sixth, the chancellor attempted to draw a causal connection between the decedent's injuries and his death, when the only evidence was to the contrary. Seventh, the chancellor failed to understand the posture of this case, suggesting that the pleadings to open the Estate were filed by Gillis, when in fact they were filed by Ronald Michael. Finally, the chancellor failed to understand Gillis's request for fees, because he (Gillis) did not request the amount of $55,550, but rather, he sought an award of one-third of the $450,000 recovered on the survival claim by the Estate. In sum, Gillis argues that "a chancery court cannot be said to be acting within its discretion in issuing a judgment where the predicate facts are simply incorrect."
¶ 29. In response to these assertions, the Estate argues that the chancellor obviously understood that the "specific issue" before the court was whether Gillis was entitled to a quantum meruit fee, and the amount of the fee if such a fee was warranted. The chancellor clearly understood and applied the applicable law in awarding quantum meruit fees in accordance with Rule 1.5 and this Court's decision in Mauck. Further, even if the chancellor's opinion and judgment contained some factual inaccuracies, Gillis has failed to establish how he was unduly prejudiced by these alleged errors.
¶ 30. We agree. While the chancellor's opinion and judgment were not written with the precision we would prefer, none of the factual misstatements appear to have affected the final resolution of this case. Further, Gillis has failed to cite any authority in support of his contention that these inaccuracies require reversal, other than citing the general manifest error standard of review. At most these inaccuracies amount to harmless error and do not rise to the manifest error requirement mandated for reversal.
V. FAILING TO REDUCE THE QUANTUM MERUIT FEE DUE TO A CONFLICT OF INTEREST.
¶ 31. The Estate, on cross-appeal, argues that the chancellor erred by declining to consider whether Gillis had a conflict of interest in representing both the Estate and Marietta in her individual capacity, and if so, whether his quantum meruit fee should have been reduced as a result of the conflict.
¶ 32. In response, Gillis cites Wilbourn v. Stennett, Wilkinson & Ward, 687 So.2d 1205 (Miss.1996), arguing that the Estate waived the conflict issue by failing to seek his disqualification when the conflict became apparent.
¶ 33. We agree with Gillis. As this Court observed in Wilbourn, the fact that a party is required to seek disqualification of counsel when a conflict first becomes apparent is based partially on the *649 rationale that the law disfavors ambush tactics in litigation. Id. at 1217. It is clear that the potential conflict was apparent early on in the action at hand as evidenced by the fact that Gillis obtained a written waiver from Scott and Ruby so that he could represent all interests at mediation. Scott and Ruby were at all times represented by separate counsel who failed to object to the conflict, raising the issue only when Gillis sought remuneration from the Estate.
¶ 34. We hold that the Estate is not to be permitted to hold this issue in reserve for tactical purposes until it would be most helpful to its position. Thus, the Estate waived this issue by failing to seek Gillis's disqualification when the conflict became apparent.

CONCLUSION
¶ 35. Concluding that none of the assignments of error on appeal or crossappeal mandates reversal, we affirm the judgment of the Alcorn County Chancery Court.
¶ 36. AFFIRMED.
PITTMAN, C.J., SMITH, P.J., WALLER, EASLEY AND CARLSON, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. McRAE, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J.
McRAE, P.J., Dissenting:
¶ 37. The trial court erred in its blanket determination that the contingency contract was not enforceable. All parties and lawyers agreed not to challenge the validity of the fee arrangement beyond the issue presented to the Chancery Court of Alcorn County. They received the benefits of the services provided under the contingency fee contract and are now estopped from saying that it should not be enforced. Therefore, I would reverse the trial court decision to grant an hourly rate in lieu of the agreed upon contingency fee contract. Accordingly, I respectfully dissent.
¶ 38. The majority misses the crux of the matter in this case. While I agree that it was not error for the chancellor to remove Marietta as the representative of the estate, it was error for the chancellor to cancel the contingency fee contract which the attorneys's labored under for almost two years, and then change the contract from a contingency fee to a quantum meruit. This puts the attorneys at an undue burden since no time records were required. Later the estate and heirs entered a new contract between Scott and Ruby Gillies and their attorneys and Gillis signed "in consideration of the services rendered for them by [Gillis], [that] they will not attack the validity of [Gillis's] fee arrangement beyond the issue presently before the [court] in Ruby Gillies' complaint..." However, Ruby's petition was to primarily remove Marietta as administratrix. In effect, Scott and Ruby executed an amended settlement agreement by which they acquiesced and agreed to Gillis being retained on a contingency fee basis to negotiate and mediate a settlement.
¶ 39. Gillis fully performed the obligations under the contract by obtaining the lump settlement of $600,000. He settled the estate's claim for $450,000 and Marietta's individual claim for $150,000, which included the $50,000 contribution from the law firm. Gillis was paid a 40% contingency fee of $60,000 on Marietta's recovery pursuant to the contract approved by the chancellor. However, on July 28, 1999, the estate filed a petition seeking approval to compromise the estate's claims against the law firm for $450,000 and to establish Gillis's quantum meruit fee on an hourly rate basis.
*650 ¶ 40. All parties acknowledged that the Gillis did the majority of the work in negotiating and obtaining the settlement. In fact, the parties were so pleased with the settlement that they chose to write letters saying what a great job they had done. The attorney for the estate wrote Gillis a letter which states "you have done an excellent job in negotiating a settlement for the estate in the amount of $500,000...." A similar letter was sent from Ruby's attorney which states "I believe you have done an excellent job in getting the carrier to place $550,000 on the table." Gillis had completely resolved and finalized the professional malpractice claims to everyone's satisfaction. Yet, they sought to deny him payment on a contingency fee basis, after having acquiesced into that arrangement. The parties should be estopped.
¶ 41. The chancellor considered the eight factors delineated in Rule 1.5 of the Mississippi Rules of Professional Conduct and awarded a quantum meruit fee of $21,210, based on Gillis's customary hourly rate of $140 for 151.5 hours. Gillis had claimed 202 hours but the chancellor reduced that amount to 151.5 to compensate for Gillis's separate representation of Marietta. The chancellor found that it was admitted by all involved that Gillis did a commendable job in perfecting the settlement involved in this matter. However, the chancellor did not award any expenses, costs or interest in the case.
¶ 42. The chancellor abused his discretion and reached an improper result in disregarding the 33 1/3 percent contingency fee contract to which all parties had acquiesced, and, instead, awarding quantum meruit attorneys' fees based on an hourly rate. After it was apparent that the 33 1/3 percent contingency fee arrangement was not going to be honored, Gillis requested payment of $275 per hour for 202 hours of work. Instead, the chancellor awarded Gillis $21,210. The chancellor calculated this amount "by taking his hours worked (151.5) at $140.00 per hour...."
¶ 43. At the heart of Gillis's complaint is the fact that the $21,120 quantum meruit award is such a small percentage (4.7%) of the total award, considering Gillis would have received 33 1/3 percent under the original contingency fee contract. In many cases, whether a fee is reasonable absolutely depends on whether the fee charged resulted from a fixed fee contract or a contingency fee contract. This is one of the eight factors we noted should be addressed when determining the reasonableness of attorneys' fees. See Miss. R. Prof'l Conduct 1.5(8); Mauck v. Columbus Hotel Co., 741 So.2d 259, 269 (Miss.1999). The majority relies heavily, almost completely, on Mauck, which is good law.
¶ 44. However, the award should reflect the fact that the original contract, under which Gillis rendered services, was a contingent fee contract. The reasonable quantum meruit fee in this case should be a reasonable percentage of the total settlement and not an hourly rate. The fact is that all affected parties agreed to and acquiesced in a contingency fee arrangement for the purposes of obtaining a settlement on the professional liability claim. Gillis received a $60,000 contingency fee from Marietta. This fact promotes the underlying issue that there was a general understanding that Gillis would receive his fee based on a percentage of the settlement or recovery.
¶ 45. The chancellor should have awarded quantum meruit on a contingency fee basis. All parties knew the fee arrangement was on a contingency basis. We have said in Tyson v. Moore, 613 So.2d 817 (Miss.1992), that quantum merit can also be on a basis of percentage, because as oftentimes, lawyers will take a contingency *651 fee contract and not keep up with their hours. Since all parties were aware of and familiar with the contingency fee contract, they, in essence, acquiesced into it. The chancellor had previously approved the 33 1/3 percent contract. This fee is reasonable in this case and consistent with Rule 1.5 and Mauck. In light of the previous agreement, the chancellor should have made a quantum meruit award based on a percentage fee.
¶ 46. There is no sufficient legal basis for the chancellor's determination that a quantum meruit contract should not have been based on a percentage of the award in this case. The chancellor and the majority overlook the simple fact that all along the understanding was that the fees were to be calculated on a percentage basis and further, that all parties acquiesced in this arrangement via their actions.
¶ 47. Accordingly, I respectfully dissent.
DIAZ, J., JOINS THIS OPINION.
NOTES
[1] Because at all times pertinent to this case, attorney Gillis apparently worked for the Luckett Law Firm, we will use "Gillis" to refer to either or both.
[2] The same chancellor who had initially approved the contingent fee contract, voided the contract, ab initio, after learning that Marietta had previously made a false claim that she and her husband were Alexander's only heirs in order to secure her appointment as administratrix of the Estate.
[3] The dissenting opinion states: "However, Ruby's petition was to remove Marietta as administratrix. It was not to cancel the contingency fee contract." Diss. op. at ¶ 38. This statement conflicts with the record before this Court. Ruby's complaint included the following prayer on its second page: "That the contingent fee contract with Attorney Gillis be terminated."
[4] The Estate sought to deny or limit Gillis's quantum meruit fee, citing three reasons: (1) Gillis had refused to provide the Estate with time records of the time it had spent prosecuting the Estate's claim prior to Marietta's removal and the voiding of its contract; (2) the Estate believed Gillis would seek to recover fees for work actually performed for Marietta in her individual capacity; and (3) the Estate contended that Gillis had a conflict of interest arising out of representing Marietta, individually, and as administratrix, and this conflict adversely affected the amount of the Estate's settlement.
[5] It is not entirely clear, in any event, that Tyson actually endorses a percentage-basis quantum meruit award:

... [Attorney] Moore deserved some compensation in recognition of the amount of work he had successfully performed in [client Harriett's] behalf. It is clear Moore's efforts produced for Harriett substantial benefits. With this in mind, this Court reverses and remands to the chancery court for its determination of compensation owed to Moore. Moore is not entitled to a twenty-five (25%) fee, but only to such fee as the chancellor may find to be reasonable for the work performed by Moore for Tyson, less any losses caused the client by Moore's adversarial and inappropriate actions.
Tyson, 613 So.2d at 828 (emphasis added). On what basis the chancellor then determined the reasonable fee is not before this Court.
[6] The dissenting opinion's conclusion to the contrary is predicated upon the claim that the chancellor "disregard[ed] the 33 1/3 percent contingency fee to which all parties had acquiesced." Diss. op. at ¶ 42. We have seen that the contingency-fee contract was voided by the chancellor. Hence, Ruby and Scott could not have "acquiesced into" that arrangement merely by being "aware of and familiar with the contingency fee contract," since their awareness extended to that contract's being voided.