# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CA-00941-SCT

*ERNEST LANE, III, AS EXECUTOR OF THE ESTATE OF JAMES OLDRUM SMITH, JR. AND LIMESTONE PRODUCTS, INC.*

*v.*

*RONALD D. LAMPKIN*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/20/2016 |
| TRIAL JUDGE: | HON. GEORGE WARD |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | HARRIS H. BARNES, III |
| | JAMES WILLIAMS JANOUSH |
| ATTORNEYS FOR APPELLEE: | DAVID W. MOCKBEE |
| | D. WESLEY MOCKBEE |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART AND REVERSED AND RENDERED IN PART. ON CROSS-APPEAL: AFFIRMED - 07/20/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE DICKINSON, P.J., KING AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     The Chancery Court of Warren County, First Judicial District, found that Ronald Lampkin had breached his fiduciary duties to Limestone Products, Inc. ("Limestone").[1] Lampkin and James Oldrum Smith Jr. jointly owned and operated Limestone with a line of

---

[1] A portion of the facts below is adapted from ***Lane v. Lampkin***, 175 So. 3d 1222, 1223 (Miss. 2015) (***Lampkin II***), and a portion of the facts is quoted verbatim from our previous opinion.

credit personally guaranteed by each of them. Upon Smith's death and his estate's refusal to guarantee the line of credit, Lampkin formed Delta Stone, a new corporation which operated on the same property, used the same facilities, and sold rock to the same clients to whom Limestone had sold.

¶2.     Lampkin sought a declaratory judgment against the estate that he was not violating his fiduciary duties to Limestone. The executors of the estate counterclaimed for lost profits and attorney's fees. At the liability stage of the bifurcated trial, the chancellor determined that Lampkin had breached his fiduciary duty to Limestone by usurping a corporate opportunity. In the damages, stage of the trial, the chancellor considered expert testimony, awarded damages, and denied the executors' request for attorney's fees, expert-witness fees, and punitive damages. The executors appealed and the Court of Appeals affirmed. *Lane v. Lampkin*, 176 So. 3d 62, 75 (Miss. Ct. App. 2014) (*Lampkin I*). This Court granted certiorari, reversed the Court of Appeals and found that the chancellor had abused his discretion in calculating the damages award. *Lampkin II*, 175 So. 3d at 1231. This Court remanded for the chancellor to re-evaluate damages. *Id*.

¶3.     On remand, the chancellor reassessed the damages due to Limestone as a result of Lampkin's breach of his fiduciary duties. Aggrieved, the executors appeal again. As explained below, we affirm in part and reverse and render in part.

## FACTS AND PROCEDURAL HISTORY

¶4.     Quoting from *Lampkin II*:

> In 1995, Lampkin and Smith formed Limestone, which they operated on land
> they jointly owned in Warren County. Lampkin and Smith each owned a

2

one-half interest in the corporation, which bought and sold rocks. Lampkin also owned Lampkin Construction, which became one of Limestone's biggest customers.

For ten years, Limestone operated on a line of credit personally guaranteed by both Lampkin and Smith. The line of credit was set to expire in September 2006. In August 2006, Smith died, and his stock in the corporation and his interest in the real property transferred to the Estate. Prior to the expiration of Limestone's line of credit, Lampkin secured an extension until December 8, 2006, to provide the Estate with time to determine whether it would guarantee the loan. Between September 2006 and December 2006, the parties discussed renewing the line of credit. However, the Estate failed to provide a guarantee before the deadline. Lampkin then formed a new corporation, Delta Stone, which began operating in January 2007. Delta Stone performed the same functions as Limestone, and through his new company, Lampkin completed Limestone's contracts and satisfied its debt obligations.

Lampkin filed a lawsuit against the Executors in Warren County Circuit Court. . . . The Executors filed a counterclaim against Lampkin for present and future profits the corporation lost due to Lampkin's actions and for attorney[']s[] fees. [O]ne of the [E]xecutors[] also filed a motion to transfer the matter to Warren County Chancery Court.

The circuit court judge entered an order finding the matter to be proper for a declaratory judgment. Further finding that the chancery court possessed proper jurisdiction over the subject matter of the declaratory-judgment action, the circuit court judge granted the motion to transfer the matter to chancery court. In an order entered by the Warren County Chancery Court, all the chancellors recused themselves from the case, and the Mississippi Supreme Court appointed a special judge to preside over the proceedings.

. . .

Following the chancellor's ruling that Lampkin breached his fiduciary duty to Limestone by starting Delta Stone and usurping a corporate opportunity, the parties presented evidence as to the

3

damage that resulted from Lampkin's breach of duty. Both parties hired an expert to testify as to the valuation of Limestone. Lampkin hired Brent Saunders, and the Executors hired James Koerber. The chancellor accepted both experts as certified public accountants and experts in the field of business valuation.

. . . Koerber's expert report indicated that between 2000 and 2007, Limestone's average net income was $20,914.00. Koerber opined that, in total, 649,203 tons of rock were diverted from Limestone between 2003 and 2011. This unreported rock was, beginning in 2007, diverted to Delta Stone: "you've got all of this unreported rock that went through say Delta [S]tone and then some that should have been attributable to Limestone." Based on the unreported rock, Koerber testified that Limestone had incurred lost-profit damages of $1,095,281. Additionally, Koerber calculated that the lost-profit damages from 2011 through 2012 had been $270,804.00, which he based on "the average of 2007, 2008, 2009, and 2010's lost profits." Koerber estimated that lost profits amounted to $1,366,085, which he rounded down to $1,366,000. He then added $169,129 to that figure to account for loss of assets, bringing the total loss to $1,535,129. The chancellor indicated in his valuation order that "the Smith estate's portion, based on Koerber's figures, would be $767,564.50."

Saunders, Lampkin's expert, testified that the rock was not "unreported," as Koerber had stated, but that Lampkin had "moved the tons from Limestone to Delta Stone." According to Saunders, the tons of rock "may be unreported in Limestone but we've got a accounting and analysis" which shows that "they just moved over to Delta Stone because [Lampkin] kept on running the thing just like he was doing before." Instead of conducting a lost-profits analysis, Saunders conducted a valuation of the "net book value" of Limestone. As of 2006, the year Smith died, Saunders opined that the net book value was $165,000. The 2007 valuation, according to Saunders, was $156,000. According to the chancellor, "[a]fter deductions, Saunders added the value of the corporation's remaining assets" and "arrived at a total net book value of $125,546.32." Saunders stated that $62,773.16 was owed to the Smith estate.

The chancellor then conducted an independent assessment of the damages, which he chronicled in a Judgment on Valuation of Business. He acknowledged Saunders's calculation of net book value, including deductions, at $125,546.32. He opined that "in making an assessment of lost profits from January 1, 2008[,] forward the more fair assessment of damages would be that of historical lost profits." He then took into consideration Koerber's calculation of average yearly net income of $20,914, multiplied that figure by five, representing the years 2008 through 2012, and concluded that the "historical

4

lost profits" amounted to $104,570. Therefore, "[u]tilizing the net book value provided by Saunders, in addition to the historical costs, the Court finds that the total sum of damages due to Limestone Products totals $230,116.32." The chancellor ordered Lampkin to pay $230,116.32 [to Limestone] "as a result of his usurpation of corporate opportunity," or otherwise $115,058.16 [to the Estate], in the event the parties reached an agreement to dissolve the corporation. The chancellor denied the executors' request for attorney[']s[] fees, expert-witness fees, and punitive damages.

Aggrieved, the executors appealed the chancellor's judgment, and the case was assigned to the Court of Appeals. The Court of Appeals affirmed, finding that the chancellor had not abused his discretion in the methods he employed to assess the damages owed to Smith's estate, in determining that Lampkin's expert had accounted for the unreported rock, in failing to award damages based on unpaid rent due to Limestone, and in failing to award costs to Smith's estate. After filing the requisite motion for rehearing in the Court of Appeals, the executors timely filed [a] . . . petition for a writ of certiorari . . . . The executors of Smith's estate assert[ed] that the chancellor employed the wrong analysis in assessing damages, that the chancellor failed to take into account the unreported rock in assessing damages, that the chancellor failed to award damages based on unpaid rent due to Limestone, and that the chancellor failed to award attorneys' fees, expert-witness fees, and punitive damages to the Smith Estate.

*Lampkin II*, 175 So. 3d at 1223–27 (quoting *Lampkin I*, 176 So. 3d at 88–91).

¶5.     In *Lampkin II*, this Court reversed the judgment of the Court of Appeals and found that the chancellor had abused his discretion in awarding damages. *Lampkin II*, 175 So. 3d at 1231. This Court held that

The chancellor's calculation of "historical net book value" was misleading because it did not account for a rock price increase after Lampkin's breach, and also because it was, without explanation, based only on the years 2008 through 2012. The chancellor's business valuation ignored our precedent which instructed him to calculate the "entire loss suffered by the corporation" as a result of Lampkin's breach of fiduciary duty and usurpation of corporate opportunity.

*Id*. at 1229–30. This Court also remanded for the chancellor "to take into account the

5

unreported rock in his calculation of lost future profits" and "reconsider whether the Smith estate is entitled to lease proceeds from 2007 . . . onward" *Id*. at 1230-31. In sum, the chancellor on remand was to evaluate the "entire loss" to Limestone by considering: (1) the rock price increase after Lampkin's breach, (2) the time frame of the loss, (3) the unreported rock and (4) the lease.

¶6. Upon remand from *Lampkin II*, the chancellor, by agreed order, allowed Lampkin to amend his complaint. In the amended complaint, Lampkin requested that he receive the "reasonable rental value" for his one-half interest in the property that was subject to the lease from Big River Shipbuilders, one of Smith's businesses that also operated on the same property.

¶7. On May 23, 2016, the chancellor entered his Judgment on Remand. At the outset, the chancellor recognized that the parties had determined the record was complete and had provided additional briefing and argument in the form of proposed judgments. After a review of the record, though, we did not find any proposed judgments from the parties. Lampkin submitted an additional brief to the chancellor before his Judgment on Remand. No additional briefing or supplementation from the estate is in the record. The chancellor also recognized that this Court instructed him to evaluate the entire loss suffered by Limestone.

¶8. The chancellor first valued the damages due to the estate for lost assets at $36,811.50. This figure was calculated by examining Limestone's assets on December 31, 2006, and subtracting Limestone's assets it still had in 2012 along with various expenses the estate owed Limestone.

¶9.     Next, the chancellor calculated the entire loss suffered by Limestone. Under this calculation, Limestone was owed $288,177.02, of which the estate was owed half—$144,088.51. In calculating this figure, the chancellor found that the damages period for lost profits should be calculated from 2007 through 2012. To calculate Limestone's lost profits, the chancellor used Koerber's figure of 89.15 percent for the cost of goods sold by Limestone. The chancellor then added an amount for shrinkage, the amount of rock lost in transport to Limestone, arriving at a total figure of 90 percent for the cost of goods sold. The chancellor noted that this figure was less than the actual cost of goods sold by Limestone and Delta for the years 2007 and 2008. The chancellor next calculated the average operating expense per year at $281,055.40 by averaging five years of actual expenses from the companies from 2003 through 2007. Again, the chancellor noted that this number was somewhat lower than the actual sales reflected by Delta Stone. Using these figures, the chancellor estimated the lost profits due to Limestone as $240,147.52.

¶10.    The chancellor then turned to the issue of unreported rock. Beginning his analysis, the chancellor recognized, "this court does not find that either Lampkin or Smith operated Limestone Products to either shareholder's detriment in the period before . . . Smith's death in August of 2006." After reviewing the expert reports, the chancellor determined that he could account for all but 36,000 tons of unreported rock, which he valued at $36,000 per an early agreement by Lampkin and Smith that Lampkin could purchase his rock at $1 per ton plus costs. The estate, therefore, was owed $18,000 for the unreported rock under the chancellor's calculations.

¶11. The chancellor next analyzed the amount due Limestone under the lease agreement. Recognizing a partition judgment, entered on November 9, 2011, held that Lampkin was the sole owner of the land on which Limestone had operated, the chancellor calculated the amount of rent due to the estate from 2007 through November 2011. Under the lease, the estate was due $2,000 a month, which totaled $118,000.

¶12. Last, the chancellor found that Lampkin was entitled to a $96,000 setoff—for management of Limestone after Smith's death—which would be applied against the estate's damages award. Applying this setoff, the chancellor determined that the estate was owed $220,900.01.

¶13. Aggrieved, the estate now appeals and Lampkin cross-appeals. The estate raises several issues which we restate for clarity. First, the estate argues that the chancellor erred in his lost-assets calculation. Second, the estate maintains that the chancellor erred in calculating the lost profits due to Limestone. Third, the estate finds error in the chancellor's valuation of the unreported rock. Fourth, the estate argues that the chancellor erred in his calculation of damages under the lease. Fifth, the estate claims that the chancellor should have awarded it attorney's fees. In response, Lampkin cross-appeals one issue, arguing that the chancellor erred in his calculation of damages under the lease.[2]

**STANDARD OF REVIEW**

¶14. "We always review a chancellor's findings of fact, but . . . will not disturb the factual

---

[2] We note that, while both parties cite the record in *Lampkin II* (Cause No. 2013-CT-00554-SCT), neither party moved this Court to consolidate the prior record with the current appeal. We have, however, considered the prior record in our review of this appeal.

8

findings of a chancellor when supported by substantial evidence unless [we] can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or applied an erroneous legal standard." *Lane v. Lampkin*, 175 So. 3d 1222, 1227 (Miss. 2015) (internal quotations omitted). This Court reviews questions of law under a de novo standard. *Id*. Further,

> [i]n the context of a damages assessment, which is a finding of fact, "the appellate court must review the damages award by looking to the 'facts of each case.'" We have held that "damage awards are only overturned when the trial judge has abused his discretion or 'in exceptional cases where such awards are so gross as to be contrary to right reason.'"

*Id*. (quoting *Greater Canton Ford Mercury, Inc. v. Lane*, 997 So. 2d 198, 206 (Miss. 2008); *Texaco, Inc. v. Addison*, 613 So. 2d 1193, 1202 (Miss. 1993)).

## ANALYSIS

### I. Lost Assets Calculation

¶15. The estate first argues that the chancellor erred by reducing the lost-assets calculation by $55,104 in his judgment on remand. Lampkin agrees that $55,104 was incorrectly deducted from the asset calculation. Therefore, we reverse and render on this issue and hold that one-half, $27,552, should be added back to the amount due to the estate for a lost-assets total of $64,363.50.

### II. Lost Profits

¶16. In Mississippi, a party may recover for loss of future profits "as long as such profits are proved with reasonable certainty, not based on speculation or conjecture." *Lovett v. E.L. Garner, Inc.*, 511 So. 2d 1346, 1353 (Miss. 1987). "This Court has stated that 'there are no

guidelines set in stone specifying the degree of certainty that we require of parties in proving loss of future profits.'" *Lane v. Lampkin*, 175 So. 3d 1222, 1228 (Miss. 2015) (quoting *Lovett*, 511 So. 2d at 1353). Further, "the degree of proof required usually depends on the particular facts of the case." *Lovett*, 511 So. 2d at 1353. This Court has been clear that:

> Liability cannot be escaped on the grounds that the proof as to the amount of damages, if any, is too uncertain to justify the lower court's award. It is well recognized that "Mississippi is equally firm in its determination that a party will not be permitted to escape liability because of the lack of a perfect measure of damages his wrong has caused."

*R & S Dev., Inc. v. Wilson*, 534 So. 2d 1008, 1012 (Miss. 1988) (quoting *Johnston v. Safeco Ins. Co. of Am.*, 727 F.2d 548, 551 (5th Cir. 1984)).

¶17.    Within the context of recovering lost profits due to a breach of fiduciary duty, this Court has recognized that:

> Although recovery of profits may be awarded where one who breaches a fiduciary obligation makes profits in excess of the loss caused by the breach, . . . one who breaches a fiduciary obligation is responsible for the entire loss suffered by the corporation as a result of the breach. This liability is not limited to the recovery of profits or to "out-of-pocket" loss.

*Aqua-Culture Techs., Ltd. v. Holly*, 677 So. 2d 171, 183–84 (Miss. 1996) (quoting *Norte & Co. v. Huffines*, 288 F. Supp. 855, 864 (S.D.N.Y. 1968)). The *Huffines* court found that, in the context of a shareholders' derivative suit, the "entire loss suffered by the corporation" as a result of a fraudulent stock exchange should be "measured under the 'loss of the bargain' rule." *Huffines*, 288 F. Supp. at 864. Within this context, the damages due to a corporation are measured by the difference between the value of what the corporation would have received if the false and misleading representations as to the value of the stock were true and

10

the value of what the corporation actually received. *Id*.

¶18. While lost profits due to a usurped corporate opportunity cannot be measured in exactly the same manner as damages due to a fraudulent exchange of stock, the principle undergirding the "loss of the bargain" rule applies here. The estate is due damages calculated as one-half of the difference between the value of the lost profits Limestone would have received if Lampkin had not usurped Limestone's corporate opportunity and the value of what Limestone actually did receive. *See Huffines*, 288 F. Supp. at 864. Here, the chancellor's award accords with this principle and was not an abuse of the chancellor's discretion.

¶19. The chancellor consistently cited the fact that he was calculating the entire loss to Limestone pursuant to this Court's instructions on remand. In order to do this, the chancellor looked to the evidence in the record to calculate two figures: (1) the cost of goods combined with the shrinkage factor and (2) the average operating expense figure. The chancellor used portions of Koerber's reports to calculate these two figures. Next, the chancellor used these figures and the gross sales from Delta Stone for the years 2007 through 2011 to calculate the lost profits due to Limestone.

¶20. The estate strenuously argues that the chancellor's reliance on these figures from Koerber's financial analysis was error. The estate argues that, instead, the chancellor should have accepted Koerber's calculation of lost profits in his forensic analysis. It is settled law, however, that the admission or exclusion of expert testimony is within the discretion of the chancellor. *Giannaris v. Giannaris*, 960 So. 2d 462, 469 (Miss. 2007). The chancellor did not accept a large portion of the factual allegations concerning unreported rock on which

11

Koerber's forensic analysis primarily was based. For instance, the chancellor specifically found that neither Lampkin nor Smith, before Smith's death in August of 2006, operated Limestone to the detriment of the other shareholder. Further, we note that the chancellor specifically reincorporated his initial findings concerning the credibility of the expert witnesses into the Judgment on Remand.

¶21. The chancellor did not abuse his discretion by performing his own calculation of lost profits derived from the expert reports and testimony before him. On remand, the parties chose not to supplement the record with any additional analysis or reports. Indeed, it appears that the estate did not file anything at all before the chancellor entered his Judgment on Remand. Even now on appeal, the estate has failed to cite any authority in its briefs concerning why the chancellor erred by using figures from Koerber's financial analysis and not his forensic analysis. This Court consistently has held that "[f]ailure to cite legal authority in support of an issue is a procedural bar on appeal." *Webb v. DeSoto Cty.*, 843 So. 2d 682, 685 (Miss. 2003) (citing *McClain v. State*, 625 So. 2d 774, 781 (Miss.1993)). The lost-profits calculation that the estate argues that the chancellor should have accepted on remand was unreasonable, as the estate merely relied, once again, on the same expert testimony and reports much of which the chancellor already had rejected in his initial judgment. These findings by the chancellor were unaffected by this Court's remand. *Lampkin II*, 175 So. 3d at 1229–30.

¶22. The chancellor's calculation of $240,147.52 as Limestone's lost profits is not an abuse of discretion. The chancellor used the actual profit figures from Delta Stone to calculate the entire lost profits Limestone would have received had Lampkin not usurped Limestone's

12

corporate opportunity. *See Holly*, 677 So. 2d at 183–84 (quoting *Huffines*, 288 F. Supp. at 864).

¶23.    We note that the better practice in calculating lost profits in the usurped-corporate-opportunity context would be to avoid using the actual figures of the business that benefitted from the breach of fiduciary duty—here, Delta Stone.  Instead, it would be more appropriate to consider an estimation or projection of the future profits of the damaged business had the corporate opportunity not been usurped or to consider the past profits of the damaged business, accounting for any advantage received by the business that benefitted from the breach of fiduciary duty.  Under normal circumstances, had the chancellor chosen to project future profits, he would have had the benefit of expert reports.  As discussed above, the chancellor here rejected significant portions of Saunders's and Koerber's reports and did not abuse his discretion in calculating Limestone's lost profits himself.

¶24.    Also, as clarification for future reference, in *Lampkin II*, we did not reverse the chancellor's initial judgment solely because he used evidence of Limestone's past profits to calculate lost future profits.  *Lampkin II*, 175 So. 3d at 1228–29.  Instead, this Court recognized that, within the context of the particular facts of this case, past profits alone were insufficient to calculate the entire loss suffered by Limestone.  *Id*.  This Court stated, "The chancellor's assessment of 'historical lost net profits' in his damages calculation did not take into account Lampkin's post-breach rock-price increase."  *Id*. at 1228.  Evidence of past profits can be used as a means to calculate lost profits in the fiduciary-duty context as long as the damages award ultimately represents the entire loss to the corporation.  *Id*. at 1228–29;

13

*see also* **Sanders v. Dantzler**, 375 So. 2d 774, 777 (Miss. 1979) (recognizing in the contract context that "one way to show damages (the loss of future profits) is to introduce evidence of past profits"). In other words, the chancellor's initial judgment would have been proper had he calculated the lost profits due to Limestone by considering Limestone's past profits adjusted by such factors as the post-breach rock-price increase at Delta Stone.

¶25. This is not to say the chancellor abused his discretion, here on remand, when he decided not to use Limestone's past profits to calculate lost profits. On the contrary, the chancellor specifically ensured that the Judgment on Remand provided for the entire loss suffered by Limestone. Again, "damage awards are only overturned when the trial judge has abused his discretion or in exceptional cases where such awards are so gross as to be contrary to right reason." **Lampkin II**, 175 So. 3d at 1227 (internal quotations omitted). The cost of goods and the average expense figures used by the chancellor were less than Delta Stone's actual figures. The chancellor therefore calculated these figures with the principle of awarding the entire loss to Limestone. Further, the chancellor did not err in considering Delta Stone's actual sales figures, as he did not accept the complete testimony of either expert. In fact, using these figures ensured that the Judgment on Remand "t[ook] into account Lampkin's post-breach rock-price increase" as this Court had instructed the chancellor to do in **Lampkin II**. **Id**. at 1228.

¶26. The chancellor's award is proper under this Court's directive in **Lampkin II** and **Holly**. The award for lost profits to Limestone, on remand, is more than double the amount originally awarded by the chancellor. Thus, we find that the chancellor did not abuse his discretion on

14

this issue.

### III. Unreported Rock

¶27. In *Lampkin II*, this Court found that the chancellor had abused his discretion by "failing to take into account . . . unreported rock [diverted from Limestone to Delta Stone] in his calculation of lost future profits." *Lampkin II*, 175 So. 3d at 1230. While calculating the entire loss suffered in his Judgment on Remand, taking into account the expert testimony of both Saunders and Koerber, the chancellor determined that 36,000 tons of rock were unreported.[3] The chancellor then found that these "36,000 tons should have been paid at the rate of one dollar per ton over cost and added to the lost profits." Therefore, the chancellor valued this rock at $36,000 and determined that the Estate's damages were half of this amount, $18,000.

¶28. On appeal, the Estate argues that the chancellor's one-dollar-per-ton valuation is erroneous because it is based on an unenforceable oral agreement between Lampkin and Smith. According to the estate, the agreement provided that Lampkin could purchase rock from Limestone at one dollar per ton over Limestone's cost. The estate now contends that this oral agreement between Smith and Lampkin was too indefinite and therefore unenforceable. *See Poole v. Johns-Manville Prods. Corp.*, 49 So. 2d 891, 893 (Miss. 1951) (holding that a contract that cannot be performed within fifteen months must be memorialized in a signed writing to be enforceable). Further, the estate claims that, though this arrangement could be

---

[3] As noted above, the chancellor rejected Koerber's opinion that, beginning in 2003, Lampkin began diverting hundreds of thousands of tons of rock from Limestone.

unaffected by the statute of frauds if the parties continuously complied with the agreement, Smith and Lampkin did not always abide by this agreement because Lampkin at times paid more than one dollar per ton. The estate claims, instead, that the rock should be valued at $1.70 per ton based on Koerber's lost-profits calculation,[4] resulting in damages of $61,200, of which one half is due to the estate.

¶29. Though not raised by Lampkin, we cannot find evidence in the record that the estate has preserved these arguments for appeal. There is no indication that the estate argued to the chancellor that the agreement is unenforceable under the statute of frauds. "We will not consider issues raised for the first time on appeal." *Anderson v. LaVere*, 136 So. 3d 404, 410 (Miss. 2014). The chancellor's Judgment on Remand states that both parties presented additional briefing on remand, but the record contains only one brief—a brief submitted by Lampkin. Further, the Judgment on Remand does not mention that the chancellor relied on any oral agreement between Smith and Lampkin when valuing the unreported rock.

¶30. Even if the estate's arguments were not procedurally barred, the issue here is not the enforceability of the oral agreement, but rather whether the trial judge abused his discretion in valuing the unreported rock. "[U]nder Mississippi law, a plaintiff is entitled to the gross amount that would have been received pursuant to the business that was interrupted by a defendant's wrongful act, less the cost of running the business." *J & B Entertainment v. City of Jackson, Miss.*, 720 F. Supp. 757, 765 (S.D. Miss. 2010) (citing *Fred's Stores of*

---

[4] The estate provided no citation to the record indicating where Koerber valued the rock at $1.70 per ton.

*Mississippi, Inc. v. M & H Drugs, Inc.*, 725 So. 2d 902, 914 (Miss. 1998)). The chancellor did not abuse his discretion in valuing the rock according to the profit agreement. At trial, Lampkin testified that he had paid for at least 136,000 tons of rock under this arrangement. Saunders also testified that the parties at times had honored the agreement. Further, Lampkin's counsel elicited testimony from Koerber that Lampkin purchased rock from Limestone under the agreement. Thus, evidence in the record supports the chancellor's valuation, and we cannot say that the chancellor abused his discretion by valuing the unreported rock at $36,000.

### IV. Lease

#### A. The Estate's Appeal under the Lease

##### 1. Damages Period

¶31. The estate argues that the chancellor erred in his calculation of damages under the lease by awarding damages for only 2007 through November 2011. Without citation to any authority, the estate repeatedly argues that the damages period must be consistent and that the chancellor should have continued to award damages under the lease through July 2012. As noted above, the "[f]ailure to cite legal authority in support of an issue is a procedural bar on appeal." *Webb*, 843 So. 2d at 685. Thus, we need not address this issue.

¶32. Notwithstanding the procedural bar, the chancellor did not abuse his discretion in determining that Lampkin did not owe any damages under the lease after November 2011. In his award, the chancellor noted that the property at issue in the suit was subject to a partition judgment in November 2011 that granted the land on which Delta Stone operated to

17

Lampkin. Also, the chancellor reincorporated his initial factual finding that the estate and Lampkin were not on good terms and would not have continued to do business together for long even if Lampkin had not usurped Limestone's corporate opportunity. Thus, the chancellor did not abuse his discretion in determining that the estate was due damages only for the period when Lampkin and the estate both owned the property, before the partition judgment.

## 2. Interest on Judgment

¶33. Next, the estate argues that it is entitled to legal interest on the amount of the judgment that was awarded under the lease. "An award of prejudgment interest is reviewed for abuse of discretion." ***Theobald v. Nosser***, 784 So. 2d 142, 145 (Miss. 2001). Mississippi law provides for legal interest to the prevailing party under a breach-of-contract action. ***Sentinel Indus. Contracting Corp. v. Kimmins Indus. Serv. Corp.***, 743 So. 2d 954, 971 (Miss. 1999); Miss. Code Ann. §§ 75-17-1(1), 7 (Rev. 2016). "Prejudgment interest may be allowed in cases where the amount due is liquidated when the claim is originally made or when the denial of a claim is frivolous or in bad faith." ***U.S. Fid. & Guar. Co. v. Estate of Francis ex rel. Francis***, 825 So. 2d 38, 50 (Miss. 2002) (quoting ***Preferred Risk Mut. Ins. Co. v. Johnson***, 730 So. 2d 574, 577 (Miss.1998)).

¶34. Here, the estate is not due interest on the judgment. First, the estate's claim under the lease was not liquidated when it originally was made, as the chancellor had to determine the damages period before he could award any damages under the lease. Second, there is no indication in the record or the Judgment on Remand that Lampkin acted in bad faith. The

chancellor recognized that neither shareholder, prior to Smith's death, operated Limestone to the detriment of the other shareholder. Further, the fact that Lampkin filed this action willingly as a complaint for declaratory judgment is further evidence that he was not acting in bad faith. Therefore, the estate is not due any interest on its judgment.

### 3.    Attorney's Fees under the Lease

¶35.    The estate also claims that it is entitled to attorney's fees under the lease. This Court reviews the grant or denial of attorney's fees under an abuse-of-discretion standard. *In re Estate of Gillies*, 830 So. 2d 640, 644 (Miss. 2002). Attorney's fees are recoverable when provided for by contract. *See Jackson Cty. Sch. Bd. v. Osborn*, 605 So. 2d 731, 734–35 (Miss. 1992); *Lovett v. Anderson*, 573 So. 2d 758, 760–61 (Miss. 1990) (attorney's fees under a lease). In order to recover attorney's fees, a party "must furnish an evidentiary predicate therefor." *Key Constructors, Inc. v. H & M Gas Co.*, 537 So. 2d 1318, 1325 (Miss. 1989); *Coleman & Coleman Enters., Inc. v. Waller Funeral Home*, 106 So. 3d 309, 319 (Miss. 2012).

¶36.    Here, the lease provides: "Lessee agrees to pay a reasonable attorney's fee on any amount due hereunder which, after default in payment, may be placed in the hands of an attorney for collection." In its brief, the estate argues that an attorney's fee of 25 percent of the recovered amount under the lease is "justified." No evidence in the record supports this number as reasonable. This Court has held that it "may not judicially note what is a reasonable fee and it certainly may not merely pull a figure out of thin air." *Key Constructors*, 537 So. 2d at 1325.

19

¶37. Neither is there a presumption for a reasonable fee in this case. *Anderson*, 573 So. 2d at 761 (finding error when trial judge sua sponte determined that a 25 percent fee was reasonable under a lease); *but see **Dynasteel Corp. v. Aztec Indus., Inc.***, 611 So. 2d 977, 986 (Miss. 1992) ( holding under statute that "we will presume reasonable an attorney[']s[] fee of one-third of the judgment obtained, where the fee so calculated is not more than $5,000."); Miss. Code Ann. § 11-53-81 (Rev. 2012) (dealing with attorney's fees under Open Account Statute).

¶38. Without any evidence before us, we cannot find that the chancellor abused his discretion by not awarding attorney's fees under the lease. On remand, the estate did not supplement the record with any evidence of the reasonableness of the fees that it incurred litigating the issue of the lease in the proceedings below. In fact, as already noted above and conceded by the estate's counsel at oral argument, the estate did not supplement the record on remand at all. At oral argument, counsel for the estate argued that the chancellor had sufficient evidence before him to determine that the estate's requested attorney's fees under the lease were reasonable on the basis of the bill filed by the estate before remand.[5] Upon review of a two-page transaction listing for $163,135 in attorney's fees filed by the estate, we cannot determine what portion—if any—of the fees are attributable to the estate's litigation

---

[5] As an aside, a litigant has an affirmative duty to provide this Court with specific citations to the appellate record. M.R.A.P. 28(7) ("The argument shall contain the contentions of appellant . . . with citations to the . . . parts of the record relied on.") We have found failure to fulfill this duty a procedural bar in the past. *Matter of Estate of Smith v. Boolos*, 204 So. 3d 291, 313–14 (Miss. 2016). Here, the Estate did not provide any citation—either in its briefs or at oral argument—to its previously filed bill.

of the lease. This is not surprising, as the transaction listing was filed before the remand, but the estate did not supplement the record with any of the evidence necessary to make a finding concerning the reasonableness of the fee under the lease. Faced with no evidence to determine the reasonableness of the fee, the chancellor did not abuse his discretion by not awarding any attorney's fees to the estate under the lease, and we affirm the judgment of the chancellor on this issue.

### B.    Lampkin's Cross-Appeal under the Lease

¶39.    On cross-appeal, Lampkin argues that Delta Stone utilized only 6.82 acres of the 17.38 acres subject to the lease and should be liable to Limestone only for the acreage he, through Delta Stone, actually used. In his argument, Lampkin notes that several entities owned first by Smith and subsequently by the estate operated on the remaining 10.56 acres without paying rent to Smith or Lampkin.

¶40.    "[I]t is a question of law for the court to determine whether a contract is ambiguous and, if not, enforce the contract as written." *Royer Homes of Mississippi, Inc. v. Chandeleur Homes, Inc.*, 857 So. 2d 748, 751 (Miss. 2003). We find that the lease at issue is not ambiguous; also, neither party argues that it is ambiguous. After a review of the lease, we disagree with Lampkin on his cross-appeal.

¶41.    In 1999, Limestone entered into the original lease with Lampkin and Smith. It included the entire 17.38 acres at issue. Lampkin usurped the entire lease agreement from Limestone. As such, Lampkin is liable for "the entire loss to the corporation." *See Holly*, 677 So. 2d at 183–84. Limestone—regardless of whether it ever used the entire lease or not—lost

21

the entire lease when Lampkin breached his fiduciary duty to Limestone. Delta Stone may have operated only on a portion of the land subject to the lease, but Lampkin usurped the entire lease. Thus, we affirm the chancellor's calculation of damages under the lease on this issue.

### V. Attorney's Fees[6]

¶42. The estate also argues that the chancellor should have re-examined the issue of attorney's fees after this Court's remand. The Estate claims that damages for "the entire loss suffered" by Limestone would include an award for attorney's fees. While Limestone is entitled to damages for the entire loss suffered due to Lampkin's breach, we ultimately disagree with the estate on this issue, as damages must be allowable under the law.

¶43. Initially, we note that if an "issue was raised on appeal [,] then it has been previously litigated and therefore is barred from consideration in the present proceedings." *Larson v. Larson*, 192 So. 3d 1137, 1140 (Miss. Ct. App. 2016) (quoting *Pruett v. Thigpen*, 444 So. 2d 819, 823 (Miss. 1984)). The chancellor originally determined that the estate was not due damages for advancing attorney's fees on behalf of Limestone. This Court's decision in *Lampkin II* did not disturb this finding. *See Lampkin II*, 175 So. 3d at 1221. As such, the estate is barred from relitigating the issue of attorney's fees.

¶44. Considering the estate's argument, though, it is clear that the chancellor did not err when he did not reconsider attorney's fees in the Judgment on Remand. "This Court has

---

[6] The following analysis relates to attorney's fees claimed by the estate separate and apart from any fees under the lease, *see* Issue IV A 3 *supra*.

repeatedly held that 'in the absence of contractual provisions or statutory authority, attorney[']s fees may not be awarded as damages in a case unless punitive damages are also proper.'" ***Mullen v. Green Tree Fin. Corp.-Miss.***, 730 So. 2d 9, 15 (Miss. 1998) (quoting ***Central Bank of Miss. v. Butler***, 517 So. 2d 507, 512 (Miss. 1987)). In his initial judgment, the chancellor found that Lampkin's conduct did not justify the award of punitive damages. This Court did not specifically set aside this finding. *See **Lampkin II***, 175 So. 3d at 1221. Also, as already has been discussed, the chancellor, on remand, found that neither Lampkin nor Smith operated Limestone to the other's detriment before Smith's passing in 2006. Further, the fact that Lampkin brought the action as a declaratory judgment is evidence that supports the chancellor's determination that Lampkin's conduct did not merit punitive damages. Thus, we affirm the judgment of the chancellor on this issue.

## CONCLUSION

¶45.    We affirm the chancellor's judgment on every issue except for the calculation of lost assets. Concerning the calculation of lost assets, we reverse and render judgment in the amount of $64,363.50.

¶46.    **ON DIRECT APPEAL: AFFIRMED IN PART AND REVERSED AND RENDERED IN PART. ON CROSS-APPEAL: AFFIRMED.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KITCHENS, KING, COLEMAN AND BEAM, JJ., CONCUR. MAXWELL, J., NOT PARTICIPATING.**

23