# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-IA-01265-SCT

*OBERT LAW GROUP, P.A., AND KEITH D.*
*OBERT*

*v.*

*JANET T. HOLT, IN HER CAPACITY AS*
*EXECUTRIX FOR THE ESTATE OF DR. EDWIN*
*L. HOLT, JR., AND PREMIER TRUST, INC., AS*
*TRUSTEE FOR THE MINOR BENEFICIARIES*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/19/2019 |
| TRIAL JUDGE: | HON. JAMES CHRISTOPHER WALKER |
| TRIAL COURT ATTORNEYS: | JAMES MATTHEW TYRONE |
| | PATRICIA PETERSON SMITH |
| | KEITH D. OBERT |
| | PHILIP W. GAINES |
| | JOSHUA BRIAN STRETCH |
| | WILLIAM F. BROWN |
| | CLARK CLIFTON LUKE |
| | M. JUDITH BARNETT |
| | ROBERT DAVID MARCHETTI |
| | TRAVIS T. VANCE, JR. |
| | JEFFREY TODD WAYCASTER |
| | JERRY CAMPBELL |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | KEITH D. OBERT |
| | WILLIAM F. BROWN |
| ATTORNEYS FOR APPELLEES: | JAMES MATTHEW TYRONE |
| | CLARK CLIFTON LUKE |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 09/23/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**MAXWELL, JUSTICE, FOR THE COURT:**

¶1.     To collect attorney's fees from an estate, court approval is required.[1] So if an attorney is paid from an estate without court approval, he "takes the fee subject to the peril of having it disapproved later by the chancellor."[2] That is what happened here. Obert Law Group collected more than $180,000 in attorney's fees from Dr. Edwin Holt's estate. But it did so without first seeking court approval. After a two-day hearing, the chancellor determined only $96,951 of the attorney's fees in the estate matter were reasonable. So he ordered Obert Law Group reimburse the estate $84,945.

¶2.     "It is well-settled that the amount allowable as attorney's fees for services rendered in the administration of an estate rests within the sound discretion of the chancery court."[3] The chancellor's decisions in these cases are reviewed for abuse of discretion, and it is improper under our law to conduct a de novo review. Here, the record shows the chancellor carefully considered Obert Law Group's evidence and the factors for reasonable attorney's fees set forth in Mississippi Rule of Professional Conduct 1.5. After doing so, the chancellor determined almost $100,000 in collected fees was reasonable. Applying our required standard of review, we cannot say the chancellor abused his discretion. We affirm.

## Background Facts & Procedural History

---

[1] *In re Will of McCaffrey v. Fortenberry*, 592 So. 2d 52, 63 (Miss. 1991).

[2] *Id.* (citing *Harper v. Harper*, 491 So. 2d 189, 200 (Miss. 1986)).

[3] *Harper*, 491 So. 2d at 200 (citing *Brown v. Franklin*, 166 Miss. 899, 145 So. 752 (1933); *Schwander v. Rubel*, 221 Miss. 875, 75 So. 2d 45 (1954)).

¶3.    At the time of his death, Dr. Holt was finalizing a divorce in Texas and seeking to have his dental license reinstated in Mississippi. Dr. Holt had hired first-year attorney Joshua Stretch to represent him in the dental-licensure matter. Due to his inexperience, Stretch associated more seasoned attorneys at Obert Law Group, Keith Obert and William Brown. When Dr. Holt died, Stretch still held $73,000 as a yet-to-be-earned retainer on the licensure issue.

¶4.    Dr. Holt died tragically by his own hand at age forty-five. He left five minor children. Stretch drove Dr. Holt's mother, Janet Holt, to the funeral. According to Janet, on the way back from the funeral, Stretch approached her "about the estate." Two days later, Stretch emailed Janet, who became the estate's executrix. He told her he wanted to handle the matter but he would need to bring in Obert for his expertise in estate matters. Stretch, Obert, and occasionally Brown began working immediately on estate matters. Their efforts included locating and protecting estate assets and dealing with Dr. Holt's ex-wife, who strenuously asserted the divorce was never finalized so *she* was Dr. Holt's heir and not her five minor children.[4]

¶5.    Stretch did not return the remainder of the prior dental-licensure retainer to Dr. Holt's estate. Instead, he submitted this money to Obert Law Group, which in turn used this money to pay its first $73,000 in bills to the estate. After exhausting this money, Obert Law Group

---

[4] Apparently, before he died, Dr. Holt and his ex-wife had entered into a final divorce settlement agreement. But this agreement had not been entered into the court record in Texas—hence his ex-wife's claim they were not divorced. Eventually, the Texas court ruled the settlement agreement was enforceable and controlled. In this agreement, Dr. Holt's ex-wife relinquished any right to inherit under Dr. Holt's will, making their five minor children Dr. Holt's sole heirs.

billed the executrix. The attorneys did not seek prior court approval of their attorney's fees. Nor did they advise the executrix the bills should be court-approved before she paid them. Instead, because Janet believed she had no reason to question the invoices, she simply wrote checks from the estate to pay the invoices submitted to her—totaling $110,800. In seventeen months of representing the estate, Obert Law Group collected $181,896 in attorney's fees.

¶6.     Their representation of the estate ended when Janet petitioned the court to replace Stretch, Obert, and Brown with new counsel. At this point, their motion for final accounting and attorney's fees had yet to be approved by the court. And before approval, the trustee of the revocable trust established by Dr. Holt, to which he had bequeathed the residuary of his estate for the benefit of his family, petitioned the court for the return of all the fees they had collected. The trustee asserted Obert Law Group had never sought preapproval of its attorney's fees and had never advised Janet of her duty to first seek court approval before paying Obert Law Group with estate assets. The trustee also alleged Obert Law Group padded its bills and mismanaged the estate.

¶7.     The chancellor heard both the motion for accounting and the petition for the return of the attorney's fees in the same two-day hearing. At the hearing, Obert Law Group presented for the court's consideration a previously unsubmitted bill for almost $20,000. The chancellor questioned Stretch and Obert carefully about the $73,000 dental-licensure retainer and specific billing entries. Obert was very forthcoming and admitted he was surprised at the amount of hours billed for routine matters. Obert admitted he would have done things

4

differently in hindsight—especially as it related to the unearned portion of the dental-licensure retainer.

¶8. At the end of the hearing, the chancellor determined the attorney's fees collected from the estate were "not even remotely reasonable." The chancellor entered a detailed order in which he considered the factors set forth in Mississippi Rule of Professional Conduct 1.5 for reasonable attorney's fees. The chancellor concluded the reasonable amount of attorney's fees was $96,951. Because Obert Law Group had collected $84,945 more than the chancellor deemed reasonable, he ordered Obert Law Group to reimburse the estate that amount.

### Interlocutory Appeal

¶9. This Court granted Obert Law Group's petition for interlocutory appeal. In the interim between this Court's grant of interlocutory appeal and the parties' briefing, this Court handed down *Rogers v. Estate of Pavlou (In re Estate of Pavlou)*, 308 So. 3d 1284 (Miss. 2021). In *Pavlou*, this Court clarified that, based on *Braxton v. Johnson (In re Estate of Philyaw)*, 514 So. 2d 1232, 1234 (Miss. 1987), and its progeny, an order granting the disbursement of attorney's fees from an estate qualified as a final, appealable judgment. *Pavlou*, 308 So. 3d at 1288. Applying *Pavlou*, we find the order in this case surcharging the attorney's fees collected against Holt's estate was likewise a final, appealable judgment. Thus, while Obert Law Group followed the procedures of Mississippi Rule of Appellate Procedure 5 to appeal by permission, an appeal as of right under Mississippi Rules of Appellate Procedure 3 and 4 was also allowed.

5

**Discussion**

¶10. Turning to the merits of Obert Law Group's appeal, we affirm.

¶11. "It is well-settled that the amount allowable as attorney's fees for services rendered in the administration of an estate rests within the sound discretion of the chancery court." *Harper*, 491 So. 2d at 200. That is our binding law. Consequently, this Court will not disturb a chancellor's attorney's fees decision "unless it is manifestly wrong." *McLemore v. McLemore (In re Estate of McLemore)*, 63 So. 3d 468, 485 (Miss. 2011). After review of the chancellor's decision to allow $96,951 in attorney's fees and to surcharge the remaining $84,945 in excess collected fees, Obert Law Group has not met the high bar of showing the chancellor was manifestly wrong.

**I.      Rule 1.5 Reasonableness Determination**

¶12. "A lawyer's fee shall be reasonable." Miss. R. Pro. Conduct 1.5(a). And in determining the reasonableness of attorney's fees charged to an estate, a chancellor should consider the factors set forth in Rule 1.5(a):

(1)    the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2)    the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)    the fee customarily charged in the locality for similar legal services;

(4)    the amount involved and the results obtained;

(5)    the time limitations imposed by the client or by the circumstances;

(6)    the nature and length of the professional relationship with the client;

6

(7)     the experience, reputation and ability of the lawyer or lawyers performing the services; and

(8)     whether the fee is fixed or contingent.

***Rich v. Moore (In re Estate of Johnson)***, 735 So. 2d 231, 237 (Miss. 1999). In his order, the chancellor considered each factor.

¶13.   In particular, regarding factor (1)—the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly—the chancellor agreed, because of the actions of Dr. Holt's recalcitrant ex-wife, this case involved "a bit more leg work." But the chancellor did "not find that the labor and time required would justify the amount of attorney's fees charged." This was certainly a discretionary call.

¶14.   Regarding factor (3)—the fee customarily charged in the locality for similar legal services—the chancellor found that in this case Obert's hourly fee of $300 to $350 was excessive. The same was true for the $300 to $350 fee for Brown, who worked very little on this case. The chancellor reduced Obert's hourly fee to $250 and Brown's to $175. He also reduced Stretch's hourly fee from $175 to $150 in light of Stretch's inexperience. The chancellor found multiple billing entries for clerical work that should not have been billed—let alone billed at a rate of $350 per hour. This included billing for attorneys to drive to court to file documents that could have been mailed or delivered by a nonattorney.

¶15.   Factor (4)—the amount involved and the results obtained—gave the chancellor "great concern." The chancellor found the "results obtained were minimal given the amount of

7

money charged to the estate." In particular, the chancellor noted the estate was billed for several pleadings that were drafted and reviewed "to exhaustion" but never filed.

¶16. Finally, factor (7)—the experience, reputation and ability of the lawyer or lawyers performing the services—also weighed heavily in the chancellor's reasonableness determination. The majority of the work performed and charged to the estate was done by Stretch, an inexperienced attorney, who had just passed the bar. Stretch spent a significant amount of time researching issues and writing memos for Obert, a lawyer with more than thirty years' experience. In the chancellor's view, Obert—an experienced estate lawyer—should have limited or deemed much of the research unnecessary given his own knowledge and extensive experience. Instead, the estate was charged more than $13,000 for research alone. Moreover, the estate was charged $350 an hour to draft routine pleadings. And Obert admitted at the hearing that the time billed to draft such pleadings seemed longer than necessary. The chancellor concluded factor (7) did not justify the amount charged to the estate. In particular, the chancellor expressed that he would not allow the beneficiaries of Dr. Holt's estate—five minor children—to pay for legal research to further Stretch's legal education. This was likewise a discretionary call.

¶17. On appeal, Obert Law Group challenges the chancellor's reasonableness determination. Its argument mainly focuses on the time required and the novelty of the case, given the difficulty of dealing with Dr. Holt's ex-wife and the uncertainty surrounding the finality of the divorce in Texas. Obert Law Group contends all work performed for the estate

was necessary and in good faith. It also asserts that, when all billed hours were averaged together, the hourly rate charged the estate was only $226.

¶18.   As to the reduction of the hourly rates, we appreciate the dissent's concerns that the fee of $300 to $350 per hour for an experienced attorney would be deemed *categorically* excessive for Mississippi practitioners. And had the chancellor ruled that charging the estate any rate more than $250 per billable hour, in and of itself, was unreasonable, we would certainly agree with the dissent that the chancellor had abused his discretion. But the chancellor's ruling was not merely based on the rate; it was based on his assessment of the circumstances and work performed. These circumstances include Obert's own concession that, when confronted by several billing entries for either simple or non-attorney tasks, he would have billed differently.

¶19.   This case highlights the risk attorneys representing an estate take when attorney's fees are not preapproved. Under Uniform Chancery Court Rule 6.07, "Claims arising after the death of a decedent, such as funeral bills, expenditures for monuments, attorney's fees, and the like must be approved by the chancellor before payment. Otherwise, payment thereof will be at the risk of subsequent disapproval by the Chancellor as to the propriety or reasonableness thereof." This Court has acknowledged that "an attorney *can* be paid a fee from estate funds without prior court approval, but the attorney takes the fee subject to the peril of having it disapproved later by the chancellor." ***In re Will of McCaffrey***, 592 So. 2d at 63 (citing ***Harper***, 491 So. 2d at 200). That is what happened here. For seventeen months, Obert Law Group billed and accepted payment for what, in its professional experience, it

9

deemed a complex estate matter justifying significant legal research and $300 to $350 hourly rates. But as the rules and case law expressly warn, it did this at its peril. Had Obert Law Group's bills been submitted to the court for prior approval, this fight would have without question been largely tempered. The lawyers would have discovered quickly that the chancellor took a much more frugal view as to the time and labor required and the reasonableness of the charged fees than the attorneys did.

¶20. In his dissent, Justice Griffis avoids the fact that the lawyers were representing the executrix—someone who by law could only pay expenses of Dr. Holt's estate upon court approval. Unif. Ch. Ct. R. 6.07. But the fact remains that they were. And our precedent makes clear that it was not enough that Janet, who was unaware of the court-approval requirement at the time she wrote checks from the estate, believed the time spent and the hourly rates were reasonable—or relied on the lawyers' reasonableness assessment. Rather, because the attorney's fees were expenses of Dr. Holt's estate, the reasonableness assessment rested "within the sound discretion of the chancery court." *Harper*, 491 So. 2d at 200.

¶21. As to this reasonableness determination, our review on appeal is quite limited. *Estate of McLemore*, 63 So. 3d at 485. We are not called upon to say whether we prefer the outcome or would have reached the same exact result. In all likelihood, we would not. We are required instead to affirm as long as the fees determination is not "manifestly wrong." *Id.* While the chancellor did stick his nose pretty deep into the billing issues here, our standard requires that we not substitute our judgment for his. We still must review his decisions for abuse of discretion. Obert Law Group has not asked or advocated for us to

10

change our existing deferential standard of review. So Justice Griffis's reweighing, recrafting, and rehandling of the attorney's fees issue, to reach his preferred method of accounting for the fees, certainly conflicts with our existing standard. But his personal evaluation does illustrate one truth—that a de novo review would be wholly subjective to each appellate judge and completely unworkable in estate fees cases. The bottom line is that we take no joy in reviewing a case where a judge has reduced attorney's fees. But we cannot disregard existing law in determining whether the chancellor's decision was manifestly wrong by retrying the facts as Justice Griffis does.

¶22.    Instead, we take the exact same approach that the Court of Appeals did in *Catchings v. Yates (In re Estate of McCullough)*, 58 So. 3d 701 (Miss. Ct. App. 2011), an opinion then-Judge Griffis joined. In that case, Attorney Catchings had billed $250 an hour for approximately 354 hours for a total of $88,550. *Id.* at 703. The chancellor determined this amount was unreasonable. And, after examining Catchings's time sheets, the chancellor allowed only $36,660. *Id.* On appeal, a unanimous Court of Appeals, in an opinion authored by then-Judge Ishee, was "of the opinion that, in most circumstances, $250 an hour for estate matters is not an unreasonable fee[.]" *Id.* But just like this case, the court was "unable to find where the chancellor abused her discretion." *Id.* The court affirmed because, as it had "held numerous times before, unless the chancellor's ruling regarding attorney's fees is manifestly wrong, the ruling will not be disturbed on appeal." *Id.* (citing *Ward v. Ward*, 825 So. 2d 713, 720 (Miss. Ct. App. 2002)).

11

¶23. Similarly, in this case, we certainly do not disagree with Justice Griffis that $350 per hour can be a reasonable rate in a complex estate matter; in fact, much more may be reasonable in some circumstances. But like the Court of Appeals in *Estate of McCullough*, we are unable to find where the chancellor abused *his* discretion. Contrary to Justice Griffis's de novo assessment, an objective reading of the record does show the chancellor carefully studied Obert Law Group's time records and Stretch and Obert's testimony. Again, ours is not a de novo review. And whether we like it or not, the chancellor did support his decision—that $181,896 in attorney's fees *in his view* was unreasonable—with substantial record evidence. This evidence included Obert's own surprise at the amount of time charged for certain routine matters. The evidence also included Obert's concessions that in hindsight he would have approached billing differently. Given this Court's precedent requiring limited review, we cannot say the chancellor was manifestly wrong in ordering Obert Law Group to reimburse the estate $84,945 it had collected, which the chancellor deemed unreasonable and excessive. And where a chancellor's estate fee decision is not manifestly wrong, it "will not be disturbed on appeal." *Id.*

¶24. In the second issue raised on appeal, Obert Law Group suggests the chancellor's "pre-disposition" against Stretch and Obert drove his determinations, not the evidence. Specifically, Obert Law Group contends the chancellor's "unnecessary, non-judicious and discourteous commentary" about the lawyers and their work overshadowed his analysis. It further accuses the chancellor of violating several canons of the Mississippi Code of Judicial Conduct.

12

¶25. Because of the serious nature of these accusations, we have carefully reviewed the entire trial transcript. Of course, a cold transcript cannot convey tone. But even so, the record demonstrates the chancellor was methodical and engaged in his handling of the hearing. The chancellor did ask many, and at times, pointed questions. And he did make a less-than-tactful comment, which Obert Law Group zeroes in on. At one point, the chancellor referred to a memo Stretch wrote for Obert as a "gold-plated Cadillac memo."[5] We admonish the chancellor to remember the high standard of conduct to which he is called. *See* Miss. Code of Jud. Conduct Canon 1. But this off-hand remark, made in the course of a two-day hearing, is insufficient evidence to call the chancellor's entire reasonableness determination into question, especially under a manifest-error standard of review.

¶26. Understandably, Obert Law Group's focus on appeal is the $84,945 in collected fees *not* approved by the chancellor. But as part of his decision, the chancellor determined more than $96,000 in legal work charged to the estate *was* indeed reasonable. The fact the chancellor approved almost $100,000 in legal fees does cut against Obert Law Group's argument that the chancellor was so biased against Stretch, Obert, and Brown that his reasonableness determination was manifestly wrong.

## II. Stretch and Obert Law Group's Relationship

¶27. Obert Law Group also argues the chancellor erred in deciding the reasonableness of attorney's fees by concluding Obert Law Group encompassed Stretch and his estate work.

---

[5] According to the chancellor, the referenced memo took sixteen hours at $175 per hour for Stretch to draft and three hours at $350 per hour for Obert to review and covered a legal issue that the chancellor himself resolved after half an hour of research.

Obert Law Group insists Stretch was associated counsel, not its employee, so he should have been surcharged as well.

¶28.    But the chancellor surcharged Obert Law Group because it was Obert Law Group that billed the estate.  And it was Obert Law Group that held and charged against the unused $73,000 retainer.  The checks the executrix wrote on behalf of the estate were accepted by Obert Law Group.  Moreover, Obert Law Group's bills indisputably included the work performed by Stretch.  Its engagement letter with the executrix listed Stretch as an attorney that would be working on the estate.  All pleadings filed on behalf of the estate were filed by Obert Law Group and listed Stretch "of counsel" with the same post-office-box address as Obert and Brown.  Stretch also testified that he performed work for the estate in Obert Law Group's conference room at the direction of Obert, to whom he reported and wrote memos.

¶29.    After review, the record supports the chancellor's conclusion that, for purposes of determining the reasonableness of Obert Law Group's attorney's fees, the estate work Obert Law Group performed included the work performed by Stretch.  Further, because Obert Law Group was the entity that billed and collected the attorney's fees without prior court approval, the chancellor did not abuse his discretion by surcharging Obert Law Group $84,945 and ordering it to reimburse the estate this amount.

### III.    Other Issues

¶30.    Obert Law Group raises two additional points of error.

14

¶31. First, Obert Law Group asserts the chancellor erred by "refusing to even consider [Obert Law Group's] final invoice" for approximately $20,000 for services performed between November 22, 2017, and February 1, 2018. While testifying, Obert admitted he had never submitted this final invoice to the estate but stated that he would "like for it to be considered." A review of the record shows, the chancellor *did* consider this invoice and the work performed in his overall reasonableness assessment. The chancellor allowed the invoice to be admitted into evidence. And in his final order, the chancellor expressly noted, "[t]he surcharge figure herein takes into consideration the unpaid invoice of Obert Law Group, PA, for charges incurred from November 22, 2017 until February 1, 2018."

¶32. Second, Obert Law Group contends the chancellor reversibly erred by not allowing it to supplement the trial record posthearing. During the first day of the hearing, the chancellor requested Obert Law Group submit certain correspondence for which it billed the estate. Obert Law Group produced this correspondence the next day as Exhibit 28 but quickly realized certain communications were missing due to a printing error. Counsel for Obert Law Group provided copies of the missing correspondence to the chancellor and other counsel, but apparently these additional letters were not admitted or made part of the record. After the hearing, Obert Law Group filed a "supplement to complete exhibit 28." The chancellor found the supplementation was not well taken and denied it. According to the chancellor, Obert Law Group had the opportunity to ensure these letters were made part of the record at the hearing. So to allow Obert Law Group to add to the record posthearing, in his view, would be prejudicial to the other parties.

15

¶33. On appeal, Obert Law Group asserts the denial of its motion was arbitrary and a product of the chancellor's alleged bias against it. The admission or exclusion of evidence is within the discretion of the trial court. *Whitten v. Cox*, 799 So. 2d 1, 13 (Miss. 2000). So "[w]here error involves the admission or exclusion of evidence, this Court 'will not reverse unless the error adversely affects a substantial right of a party.'" *Id.* (quoting *Floyd v. City of Crystal Springs*, 749 So. 2d 110, 113 (Miss. 1999)). Here, there was no exclusion of evidence because Obert Law Group never asked *during the hearing* for this additional correspondence to be made part of the record. And Obert Law Group has not demonstrated it had any right—let alone a substantial right that was adversely affected—to unilaterally add to the trial court record posthearing. This issue is without merit.

¶34. **AFFIRMED.**

**RANDOLPH, C.J., COLEMAN, BEAM AND CHAMBERLIN, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY KITCHENS AND KING, P.JJ. ISHEE, J., NOT PARTICIPATING.**

**KITCHENS, PRESIDING JUSTICE, DISSENTING:**

¶35. I join Justice Griffis's dissent in part. I write separately because I do not join in his disapproval of this Court's decision in *Cascio v. Cascio Investments, LLC*, No. 2019-CA-01506-SCT, 2021 WL 3781329 (Miss. Aug. 26, 2021), which was factually different from this case.

**GRIFFIS, JUSTICE, DISSENTING:**

¶36. The reasonableness of attorneys' fees is governed by Rule 1.5(a) of the Mississippi Rules of Professional Conduct:

16

**(a)** A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

This Court identified these factors in *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982).

¶37.    Then, in ***BellSouth Personal Communications, LLC v. Board of Supervisors of Hinds County***, this Court explained how to analyze the award of attorneys' fees:

This Court has stated *the importance of issuing a complete rule 1.5(a) analysis and gave reference to what it expects by way of credible evidence.* "The *McKee* factors should have been applied by the trial judge in determining the amount of attorneys' fees to be awarded, and *any award should be supported with factual determinations*." **Miss. Power & Light Co. v. Cook**, 832 So. 2d 474, 487 (Miss. 2002) (citing **Browder v. Williams**, 765 So. 2d 1281, 1288 (Miss. 2000)). . . .

In the case of **In Re Estate of Gillies**, 830 So. 2d 640 (Miss. 2002), we stressed the importance of making a reasonable fee determination. *Id.* at 645. In citing to both Mississippi, as well as federal precedent, we stated "what is controlling is what is reasonable." **Mauck v. Columbus Hotel**, 741 So. 2d 259, 271 (Miss. 1999). This Court further noted that the factors set forth in Rule 1.5

17

are almost identical to the "lodestar" factors established by the United States Supreme Court. *Id.* at 272. We went on to specifically cite United States Supreme Court precedent as follows:

> The United States Supreme Court adopted the "lodestar" method of calculating reasonable attorney fees. In calculating the "lodestar" fee, *the* **most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation, multiplied by a reasonable hourly rate.** This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. . . .

*In re Estate of Gillies*, 830 So. 2d at 645 (citing *Mauck*, 741 So. 2d at 271) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)) (emphasis added). We also stated:

> [T]he chancellor determined a reasonable fee, based on the number of hours reasonably expended on the litigation, multiplied by a reasonable hourly rate. He also considered the eight factors enumerated in Rule 1.5. . . . In doing so, he followed the proper procedure that this Court has established for determining reasonable attorney's fees. . . .

*In re Estate of Gillies*, 830 So. 2d at 646.

*BellSouth Pers. Commc'ns, LLC v. Bd. of Supervisors of Hinds Cnty.*, 912 So. 2d 436, 446-47 (Miss. 2005) (emphasis added).

¶38. This Court further explained how trial courts are to make this determination:

> [I]n the case at bar, *the trial judge "should have applied these factors in determining the amount of attorney's fees to be awarded and supported that award with factual determinations." To hold otherwise, would be to obligate this Court to make an original reasonableness determination* and, in so doing, deprive us of our proper judicial function as a reviewing appellate body.
>
> When a trial court makes such attorney's fees awards, *it should do so with caution and clarity*. While Miss. R. Civ. P. 41(a)(2) expressly confers upon the trial courts the discretion to assess attorney's fees, *this discretion should be appropriately exercised with findings of fact and conclusions of law*

*to undergird both the award and the amount of the attorney's fees and related expenses.*

We have accordingly expressly enumerated the standard by which such a reasonableness determination be made and have mandated that a trial court consider the eight factors enumerated in Rule 1.5 of the Rules of Professional Conduct. While the trial judge has the discretionary prerogative to make such a determination, and this Court affords substantial deference to such discretion, *a judge's discretion is not unfettered*. Moreover, trial court judges must follow the appropriate procedure *and make the requisite findings of fact necessary* to insure a losing litigant is only made to compensate his adversary for fees and expenses which were reasonably incurred. Based on the record before us, we are thus constrained, as a matter of law, to find that the trial court in today's case abused his discretion in failing to undergird his attorney's fees award with specific findings consistent with MRPC 1.5 and *McKee*.

*Id.* at 447-48 (emphasis added) (citation omitted).

¶39.  Because I find the chancellor has not made this award with clarity and consistency with the lodestar method, I respectfully dissent.  The chancellor's order should clearly set forth and allow this Court to discern the chancellor's rationale that $96,951 was a reasonable amount for attorneys' fees and that $84,945 was unreasonable.  It did not.

¶40.  The lodestar method is a calculation.  The chancellor should calculate the number of hours reasonably expended multiplied by a reasonable hourly rate.  The chancellor should also make the requisite findings of fact that explain and support the decision.

¶41.  The majority says that the "chancellor's ruling was not merely based on the rate; it was based on his assessment of the circumstances and work performed." Maj. Op. ¶ 18.  Yet the majority does not know how the chancellor arrived at these amounts, and it dismisses the fact that the chancellor offered no explanation of his assessment.  Our precedent requires the

19

chancellor make attorneys' fees awards "with caution and clarity." ***BellSouth Pers.***

***Commc'ns, LLC***, 912 So. 2d at 447-48.

¶42.　Here, we do not have a calculation or findings of fact that explain and support the decision.　For the calculation, the chancellor ruled the hourly rates were unreasonable.　The chancellor should then have applied a reasonable hourly rate to the time entries to determine the reasonable attorneys' fee.　For the time expended on this matter, the chancellor found some time entries to be unnecessary. The chancellor should then have documented the disallowed or reduced time entries and multiplied the reasonable time entries allowed by the reasonable hourly rate to arrive at the reasonable attorneys' fee.

¶43.　I simply find no evidence to support the chancellor's determination.　Without such evidence or a clear understanding as to why the award was what the chancellor determined, I find the chancellor abused his discretion and was manifestly wrong.

¶44.　In his order, the chancellor does make some findings in his analysis of the Rule 1.5(a) factors. I will examine the chancellor's analysis.

### 1.　*Attorney-Client Relationship Between Dr. Holt and His Attorney*

¶45.　"A lawyer shall abide by a client's decisions concerning the objectives of representation . . . and shall consult with the client as to the means by which they are to be pursued."　Miss. R. Pro. Conduct 1.2(a)*.*　The comment to Rule 1.2(a) says that "[b]oth lawyer and client have authority and responsibility in the objectives and means of representation. *The client has ultimate authority to determine the purposes to be served by legal representation*, within the limits imposed by law and the lawyer's professional

20

obligations." Miss. R. Pro. Conduct 1.2 cmt. (emphasis added). It is the client, i.e., Dr. Holt, who had control over the decisions about legal representation.

¶46.    Dr. Holt was an educated professional. He had accumulated substantial wealth and a personal estate that included his professional practice, land, businesses, and multiple investments across several states. Dr. Holt was not an unsophisticated user of legal services.

¶47.    Dr. Holt chose to hire Joshua Stretch to represent him before the dental-licensure board. Dr. Holt recognized Stretch was inexperienced, but he hired him anyway. Dr. Holt also chose to hire Obert Law Group to assist Stretch. Dr. Holt agreed to pay their hourly rate. Dr. Holt's decision to hire *both* Stretch, an inexperienced attorney, *and* Obert Law Group, a firm with more experienced lawyers, to represent him in an important matter is relevant here.

¶48.    Further, Dr. Holt decided to pay a premium rate for premium legal work. The chancellor is very dismissive of Dr. Holt's decision to hire Stretch and Obert. I believe the chancellor should have considered Dr. Holt's decision of whom he wanted to provide him legal representation. Also, the chancellor should have considered that Dr. Holt decided on the dual representation and certainly rejected the low-cost legal representation.

¶49.    It is the client's decision as to whom to hire and what fee to pay. There is no rule that a reasonable attorneys' fee must be based on the lowest possible cost. Dr. Holt decided he wanted excellent representation and was willing to pay a premium or, using a phrase the chancellor used, "Cadillac" rates for premium or "Cadillac" work. The consideration of the Rule 1.5(a) factors must consider all of the facts and circumstances of the legal

21

representation, including Dr. Holt's decision about whom he wanted his lawyers to be and how much he agreed to pay those lawyers in hourly rates.

¶50.    The chancellor ruled that there was no prior relationship with Stretch and Obert. Rule 1.5(a)(6) of the Mississippi Rules of Professional Conduct requires the chancellor to consider "the nature and length of the professional relationship with the client."

¶51.    The chancellor ruled that, "[w]hile there was testimony that Mr. Stretch and Mr. Obert had a limited relationship with Dr. Holt regarding a prior legal matter, there was no testimony of any professional relationship with the executrix, Ms. Holt, prior to this matter. Therefore, this factor has no weight in the Court's ruling." Yes, the client in the estate was the Executrix.[6] However, the very nature of this factor, as it relates to probate matters, is to look at the relationship between the decedent/testator and his attorneys. The consideration of this factor also contemplates that the court recognizes that probate often is the result of the decedent's decision about whom they want to prepare their will and whom they trust to handle their legal affairs. Here, the Executrix acted in a manner consistent with Dr. Holt's decision and hired Stretch and Obert and continued their earlier representation of Dr. Holt, now through the probate proceeding. In my opinion, the chancellor should also have considered Dr. Holt's decisions to hire Stretch and Obert as his lawyers and how much to pay

_____

[6] The majority claims that this opinion "avoids the fact that the lawyers were representing the executrix—someone who by law could only pay expenses of Dr. Holt's estate upon court approval. Unif. Ch. Ct. R. 6.07." Maj. Op. ¶ 20. Such is simply not true and mischaracterizes my opinion. Indeed, the executrix is the client. I simply am of the opinion that, under this factor, the chancellor must also consider the fact that the decedent made the decision to hire the attorneys to represent him in a complex matter and agreed on their compensation. Dr. Holt's choice of attorneys and agreement on compensation should be considered and not ignored. In fact, it is important and relevant information.

them. The purpose of the probate proceeding is to be sure the intent of the testator is followed in the probate of the will and the administration of his estate.

¶52. Thus, I am of the opinion that the chancellor's decision as to Rule 1.5(a)(6) is not supported by the evidence. Further, the chancellor abused his discretion by not accepting Dr. Holt's decision about whom to hire as his attorneys and how much to pay them per hour. There is neither evidence nor any reason to believe that Dr. Holt did not also want these lawyers to represent his estate.

### 2. Chancellor's Decision to Reduce the Hourly Rate and Entries

¶53. The chancellor ruled that the hourly rate charged was excessive. Rule 1.5(a)(3) of the Mississippi Rules of Professional Conduct requires the chancellor to consider "the fee customarily charged in the locality for similar legal services." Rule 1.5(a)(7) requires the chancellor to consider "the experience, reputation, and ability of the lawyer or lawyers performing the services."

¶54. The chancellor ruled:

> [I]n this case that all hourly rates charged are excessive to the degree that Mr. Obert's hourly rate should be reduced from $350/$300 to $250. Furthermore, the Court finds that Mr. Brown's hourly rate should be reduced from $350/$300 to $175 given the testimony and evidence introduced at trial concerning his work product, as Mr. Brown did not testify at the hearing. Finally, the Court finds that Mr. Stretch's hourly rate should be reduced from $175 to $150. Moreover, there were multiple billing entries for clerical work that should not have been billed to the estate and much less at the rate of the highest billing attorney.
>
> . . . .
>
> Given the fact that the majority of work billed was done by Mr. Stretch, who had just passed the bar, the amount of time spent on researching matters, which

23

this Court believes should have been limited or simply not necessary for attorneys with 30 plus years in the practice of law such as Mr. Obert, as well as excessive billing regarding routine pleadings such as the Oath of Executrix and Letters, the Court finds that this factor does not justify the amount charged to the Estate for attorney's fees. This Court will not sit back and charge the beneficiaries of this estate, which happen to be five (5) minor children, for legal research performed in furtherance of Mr. Stretch's education on estate law.

¶55. Having read the record and the chancellor's order, I find no evidence to support these conclusions. First, does the chancellor declare that no lawyer in Madison County Chancery Court may charge an hourly fee in estate matters that is more than $250 per hour? I certainly hope not. There are many outstanding lawyers in Madison County and elsewhere who routinely charge in excess of $250 per hour in wills, probate, and estate matters. If the majority prevails, I do not see how the chancellor may ever award an hourly fee more than $250 per hour.

¶56. To determine the reasonableness of an hourly rate, many things must be considered. First, the knowledge and experience of the attorney must be considered. Obert had thirty-one years of legal experience in complex litigation matters and estate work. He was Martindale-Hubbell "AV Pre-eminent" rated. Attorney William F. Brown had twenty-five years of legal experience. Dr. Holt recognized that Obert and Brown were worth the hourly rate of $350, and he agreed to pay this rate. Obert later voluntarily reduced this hourly fee to $300.

¶57. In 1999, this Court held that $1,200 or $800 per hour was an excessive attorneys' fee in a routine but high-dollar estate matter. *Rich v. Moore (In re Estate of Johnson)*, 735 So. 2d 231, 238 (Miss. 1999). But the Court also held that "[t]he considerably smaller

24

accountant's fee [$300 per hour] may be more nearly correct, but should also be reevaluated in accordance with this opinion." *Id.* More recently, now-Justice Ishee wrote for the Court of Appeals that an attorney's hourly rate of $250 was not unreasonable. *Catchings v. Estate of McCullough (In re Estate of McCullough)*, 58 So. 3d 701, 703 (Miss. Ct. App. 2011). Even more recently, in *Cascio v. Cascio Investments, LLC*, No. 2019-CA-01506-SCT, 2021 WL 3781329, at *13 (Miss. Aug. 26, 2021), the majority of this Court affirmed the trial court's award of attorneys' fees for four lawyers with less experience than Obert, who charged hourly rates from $350 up to $470 per hour, in a routine breach-of-contract case.

¶58.   So why did the chancellor reduce Obert's hourly rate by $50 per hour and Brown's substantially, and what evidence supports this decision?  I find no evidence to support this decision.

¶59.   Interestingly, the chancellor approved new lawyers to take over the representation of the estate.  According to a copy of a statement, dated October 8, 2018, the new lawyers charged the estate the hourly rate of $285 for one lawyer, an attorney with approximately fifteen years' less experience than Obert.  The statement also indicates an hourly rate of $240 for another lawyer, an attorney with approximately twenty years' less experience than Obert.

¶60.   Common sense and logic dictate that if the new lawyers, who are younger and less experienced, are allowed to charge the estate at the hourly rate of $285 or $240 per hour, this is clear evidence that supports the reasonableness of Obert's charge of $300 per hour. It certainly contradicts the chancellor's decision to reduce Obert's hourly rate to $250, and it

indicates the arbitrariness of the chancellor's decision to reduce Obert's hourly rate but to allow a higher hourly rate to less experienced attorneys.

¶61.     Moreover, if the chancellor was concerned with the beneficiaries of this estate being overcharged "for legal research performed in furtherance of Mr. Stretch's education on estate law," the chancellor could have struck or reduced the charges approved for Stretch. The chancellor then could have documented the research that was believed to be unnecessary and provided a record and a basis for the calculation to reduce the award.

¶62.     I am troubled that there is no calculation by the chancellor or any evidence of a calculation where the new hourly rate was applied to the approved legal work. Thus, I find no evidence to support the chancellor's decision to cut Obert's and Brown's hourly fees or his analysis under Rule 1.5(a)(3) and (6). The chancellor's decision under these factors was without substantial justification and was arbitrary, an abuse of discretion, and manifestly wrong.

### 3.     *The chancellor failed to consider the fact that the representation precluded other employment.*

¶63.     The chancellor ruled that the hourly rate charged was excessive. Rule 1.5(a)(2) of the Mississippi Rules of Professional Conduct requires the chancellor to consider whether the "the acceptance of the particular employment will preclude other employment by the lawyer." The chancellor held, "[t]his factor is not applicable in the case at hand and has no weight in the Court's ruling." The majority does not address this factor.

¶64.     Obert testified that they had to put down other matters to work on Dr. Holt's estate. There was evidence that Obert should have been given consideration under this factor.

26

Certainly, this factor should be considered in all attorneys' fee matters. An attorney's time is not a limitless asset. The fact that Obert documented more than $100,000 in fees clearly indicates that the acceptance of this employment precluded Obert from other employment. I find the chancellor abused his discretion in failing to consider this factor.

### 4. *The chancellor failed to consider the amount involved and the results obtained.*

¶65. Rule 1.5(a)(4) requires the consideration of "the amount involved and the results obtained." The chancellor held:

> This factor causes one of the greatest concerns for the Court. The results obtained were minimal given the amount of money charged to the Estate. There were pleadings drafted and reviewed to exhaustion but never filed with the Court, as well as pleadings and tasks that were simply not completed. There were multiple billing entries for a Motion to Compel which was never filed. Similarly, there were a Petition to Determine Heirs, Notice to Creditors and Response to Motion to Set Aside Administratrix that were never filed on MEC. Testimony at trial did not lead this Court to any better understanding of why pleadings were not filed and/or prepared in the process of administering the estate. To be clear, this Court finds that numerous billed for services provided little or no benefit to the estate.

¶66. Despite its being "one of [his] greatest concerns," the chancellor does not consider the essence of this factor. The chancellor is looking at specific pleadings, while this factor requires consideration of other issues. Dr. Holt's estate was valued at more than $3 million. Dr. Holt had property and investments in Mississippi and Texas. Dr. Holt had a valuable gun collection and insurance policies, and he was in the middle of a divorce.

¶67. The essence of this factor is to determine what Stretch and Obert brought to the estate. This was not done. I find this to be an abuse of discretion and would remand for the chancellor to properly consider this factor.

27

### 5. *Chancellor's Decision That This Was Not a Complex Legal Matter*

¶68. The chancellor ruled that this was not a complex legal matter and that the number of hours was excessive. In making this determination, the chancellor reviewed factor (1) from Rule 1.5(a) of the Mississippi Rules of Professional Conduct: "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly." The chancellor determined:

> While Mr. Obert testified as to the extreme complexity of this estate, and while the Court does agree that there may have been a bit more leg work required in this case, this Court does not find that the labor and time required would justify the amount of attorney's fees charged.

¶69. I am concerned with how the chancellor and this Court interpret the finding that "a bit more leg work [was] required in this case." This appears to be a factual finding. The majority accepts this finding.

¶70. Unfortunately, the chancellor failed to provide a proper or sufficient analysis of Rule 1.5(a)(1). The record before this Court is more than sixteen-hundred pages. The docket indicates that there were 181 entries. Moreover, in his brief, Obert provided the following list of issues and concerns that had to be dealt with in this estate:

> 1. Prior to Dr. Holt's death, the agreed upon divorce and MSA determined the ownership of his property and that to which Ruth Ann was entitled, and OLG and Stretch sought to provide Ruth Ann her property under the MSA.
>
> 2. The agreed upon divorce and MSA revoked any testamentary or beneficial interest that Ruth Ann may have had in Dr. Holt's property and Estate, including the Trust for their five (5) minor children;

28

3.    Immediately upon Dr. Holt's death, Ruth Ann told Mrs. Holt and others in the Holt family that she was traveling to Mississippi to gather Dr. Holt's property;

4.    Ruth Ann presented an imminent and credible threat to Dr. Holt's property and Estate;

5.    Ruth Ann refused to cooperate with the Estate or its counsel during the time OLG and Stretch represented the Estate;

6.    Ruth Ann refused to communicate with the Estate or its counsel during the time OLG and Stretch represented the Estate;

7.    Ruth Ann's failure to sign tax returns caused the Estate to incur unnecessary penalties and interest approximating $1,700.00 per month;

8.    Ruth Ann refused to cooperate in having titles issued for certain vehicles she received via the MSA;

9.    Ruth Ann refused to agree to the disbursement of a One Million Dollar ($1,000,000.00) life insurance policy for approximately thirteen (13) months;

10.   Ruth Ann took contradictory positions regarding the divorce and the Estate and her claim to heirship;

11.   Ruth Ann initially enrolled the Divorce Decree in Mississippi as a foreign judgment;

12.   Appellants agreed to enrolling the foreign judgment in order to establish the defense of collateral estoppel to the extent that Ruth Ann was only entitled to assets under the MSA and Divorce Decree and not the Estate;

13.   Ruth Ann accepted child support, property and financial interests, and cash provided for her in the agreed upon divorce and MSA to the extent of Two Hundred Seventy-Four Thousand Two Hundred Eighty-Four and 94/100 Dollars ($274,284.94) for Dr. Holt's future child support obligation, $600,000 for the house, $633,000 in cash, and six (6) vehicles, plus oil well and IRA interests;

29

14. Ruth Ann vehemently claimed to Dr. Holt's family that she was still his wife, refusing to recognize and thus, repudiating the divorce;

15. Ruth Ann continuously maintained that she was the sole and rightful heir of Dr. Holt's Estate;

16. Ruth Ann willingly, knowingly and voluntarily relinquished any right to inherit or benefit from Dr. Holt under the MSA dated April 11, 2016, prior to Dr. Holt's death;

17. Ruth Ann relinquished the right to serve as Trustee for, or receive any beneficial interest from, the Edwin Love Holt Revocable Living Trust under the Divorce Decree and MSA;

18. The twelve (12) page, single-spaced "gold-plated, Cadillac of memos" foresaw the actions and conduct of Ruth Ann in attacking the Estate, and provided the basis for the defense of said attacks;

19. Ruth Ann attacked the Estate when she sought the removal of the Executrix within the first four (4) months the Estate was opened;

20. Ruth Ann attacked the Estate when she insistently demanded income from the proceeds of the Trust, to which she had no claim, throughout Appellants' representation of the Estate;

21. Appellants successfully prevented Ruth Ann from obtaining any Trust funds to which she had no right;

22. Appellants anticipated, foresaw, researched and prepared to counter and defend almost every single adversarial move made by Ruth Ann Holt in this proceeding that arose both before and after their termination;

23. Ruth Ann's demands for money from the Trust now amount to her receiving more than Six Thousand and 00/100 Dollars ($6,000.00) per month, tax free, all of which occurred after Appellants' representation;

24. The Trustee for Premier Trust advised Ruth Ann that her increasing demands for money and refusal to cooperate with the Estate created a threat of depleting Trust proceeds;

25. Ruth Ann filed a Petition to Enroll a Foreign Order claiming that her divorce from Dr. Holt was not final, thereby making her the sole heir of the Estate;

26. Ruth Ann filed a Petition to Correct Death Certificate in which she demanded that the Trial Court amend Dr. Holt's death certificate to reflect that he was married but separated at the time of his death;

27. Ruth Ann attacked the Estate when she filed a Motion to Dismiss for Lack of Venue Jurisdiction and Motion for Order Compelling Premier Trust to Continue to Pay the Monthly Benefits of Premier Trust to Ruth Ann Holt, Mother of Five Children of Ruth Ann Holt and Edwin L. Holt, Jr., Deceased;

28. The twelve (12) page, single-spaced "gold-plated, Cadillac of memos" addressed issues raised and claims by Ruth Ann in the aforementioned Petition and Motion;

29. Ruth Ann appealed the denial of said Motion to Dismiss;

30. Ruth Ann's adversarial antics continued when she placed more than ten (10) change of address orders on Mrs. Holt's address for all mail addressed to anyone with the name "Holt" to Ruth Ann's address in Brock, Texas;

31. In placing the change of address orders, Ruth Ann represented and certified that she was the "person, executor, guardian, authorized officer, or agent for whom mail would be forwarded" under the orders;

32. Ruth Ann committed crimes when she placed the fraudulent change of address orders;

33. The Estate has now had to hire a Texas attorney and pay a $15,000.00 retainer to him to defend a Parker County lawsuit filed by Ruth Ann whereby she seeks to have the Divorce Decree and MSA set aside.

¶71. I have scoured the record and examined the docket. There are a number of motions and other litigated matters. It is clear from the time records that the attorneys had to deal with Dr. Holt's ex-wife and her attempts to improperly obtain property that belonged to the

31

estate. The attorneys also had to deal with the enforcement of Dr. Holt's ex-wife's claims for child support and property.

¶72. My review of the record does not find evidence to support the chancellor's dismissive statement that "a bit more leg work [was] required." Dr. Holt's estate was and is not a routine probate matter. A more exhaustive review of the record must be undertaken to determine the work performed and how it was reasonable or necessary to complete the representation.

¶73. Because I cannot find sufficient evidence to support the chancellor's award and surcharge of attorneys' fees and expenses, I am of the opinion that the chancellor abused his discretion. The chancellor may not simply pick an amount out of the air. There must be a calculation and explanation of the entries allowed and disallowed and then a calculation based on the appropriate hourly charge.

¶74. Finally, the majority attacks my opinion saying that it is my "personal evaluation" and that I am "reweighing, recrafting, and rehandling . . . the attorney[s'] fees issue, to reach [my] preferred method of accounting for the fees[.]" Maj. Op. ¶ 21. I disagree. In *Mabus v. Mabus*, we said,

> "This Court will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied." In order for this Court to say that the chancellor has abused his discretion, there must be insufficient evidence to support his conclusions.

*Mabus v. Mabus*, 910 So. 2d 486, 488-89 (Miss. 2005) (citations omitted). The majority seems to recognize the fact that the chancellor did not explain how he arrived at the amounts

that he allowed and disallowed. The majority even discusses hourly rates, but it then simply dismisses that discussion as a relevant or necessary component of the chancellor's decision. Similarly, the majority discusses scope of work, but it then simply dismisses any consideration of the actual itemized charges on Obert's fee statements.

¶75. For the second time within approximately one month, this Court has affirmed a trial court's award or disallowance of attorneys' fees without an explanation as to how the trial court arrived at the award or disallowance. *See Cascio*, 2021 WL 3781329, at *13. The standard of review is abuse of discretion, not unfettered discretion. Here, and in *Cascio*, this Court has affirmed an award without a proper explanation as to how the trial court arrived at the amount of the award.

¶76. I would reverse the chancellor's judgment for a simple reason: there is no explanation as to how he arrived at the amounts. Therefore, I find insufficient evidence to support the chancellor's disallowance of attorneys' fees. I cannot joint the majority's decision to affirm the chancellor's judgment when the majority offers no explanation as to how he arrived at the various amounts, and I simply cannot understand how the chancellor arrived at these amounts. Mississippi law requires clarity and an understandable explanation.

¶77. Thus, I respectfully dissent as to how the chancellor arrived at his decision to disallow attorneys' fees and expenses. I would remand this case for further proceedings to include a full and complete review of the attorneys' fees statements submitted and the matters involved in this litigation.

**KITCHENS AND KING, P.JJ., JOIN THIS OPINION IN PART.**

33